In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-1294

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROY YOUNG,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 052—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED NOVEMBER 1, 2002—DECIDED DECEMBER 4, 2002

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

BAUER, *Circuit Judge*. On March 19, 2001, the federal government charged the Defendant, Roy Young, under a three-count indictment; count 1 charged Young with kidnaping Beatrice Patrick on or about January 14 to 18, 2001, a violation of 18 U.S.C. § 1201; count 2 charged him with interstate domestic violence against Patrick on or about January 14, 2001, in violation of 18 U.S.C. §§ 2261(a)(1) and (b)(3); and finally, count 3 charged Young with unlawfully using or carrying a firearm during and in relation to the commission of a crime of violence on or about January 14, 2001, in contravention of 18 U.S.C. § 924(c)(1)(A). Young was later charged under a Super-

seding Indictment, alleging the same three offenses, though altering the wording in count 2 slightly.

A jury found Young not guilty of the kidnaping charge in count 1, but found him guilty of interstate domestic violence and unlawful use of a firearm under counts 2 and 3. The district court sentenced Young to consecutive five-year terms of imprisonment for counts 2 and 3. Young raises four issues on appeal: 1) whether the district court abused its discretion by admitting testimony from the government's expert regarding common patterns among domestic abuse victims; 2) whether the district court erred in admitting Patrick's grand jury testimony under Rule 801(d)(1)(A) of the Federal Rules of Evidence; 3) whether the government sustained its burden of proof that Young used or carried a firearm in violation of 18 U.S.C. § 924(c)(1)(A); and finally 4) whether the district court abused its discretion in its response to a question from the jury while it was deliberating. We affirm the decision of the district court.

## BACKGROUND

### A. *Events Prior to and Surrounding January 14, 2001*

Young and Patrick began dating in 1989, when Young was fifteen years old and Patrick was seventeen years old. During their ten- to eleven-year relationship, the couple had three children but never married. The relationship was marred by domestic violence, and in April of 2000 Patrick obtained an Order of Protection against Young. Though it appears the relationship was an off-and-on arrangement, the two were at least in touch in January of 2001, when Patrick sent word to Young that she needed money from him. At that time, Patrick lived in the Altgeld Gardens housing development in Chicago, Illinois, while Young resided in Michigan City, Indiana.

On the evening of January 14, 2001, Young drove with a friend, Forknewin Sidney, and two others from his home in Michigan City to the Altgeld Gardens development. After dropping Sidney off at Sidney's mother's home, Young located Patrick at Theresa Miller's home, a neighbor of Patrick's. In addition to Patrick, Young also found George Terry present. Patrick previously had told Terry that if Young caught the two of them together, he would kill them both.

When Young arrived at the apartment, he became visibly agitated at Terry's presence. Young kept one hand in his pocket, which apparently contained a heavier object. Terry fled the apartment, and Young proceeded upstairs and confronted Patrick by grabbing her and asking whether she had been "messing around" with Terry. This argument escalated and Young punched Patrick near her eye and told her to leave with him. The two eventually tumbled down the stairs from the second floor of Miller's home while struggling. Miller and her nephew broke the two apart and ordered both of them to leave, for fear of damage to Miller's apartment. Patrick pleaded with Miller to allow her to stay because Patrick said she could not breathe, but Miller insisted that she leave.

The argument continued outside, and Patrick eventually entered Young's car and drove to a nearby wooded area, where Patrick's car was parked. Once there, Young continued to yell at Patrick and used a car jack to smash the front passenger window of her car. Patrick also testified before the grand jury that Young said "Don't play with me" and "I'll kill you" at this time. Young then drove both of them back to Patrick's apartment and proceeded upstairs into her bedroom, where the couple's three children were present. Young told the children to get out of the room and told Patrick that she was coming with him, but Patrick refused. The two continued to argue, with Patrick refusing to go until Young picked up a plas-

tic milk crate and threatened to hit Patrick if she did not go. Patrick eventually left the apartment with Young and got into his van.

Young then drove Patrick, Sidney, and his two other friends to Michigan City, Indiana. Though Patrick testified at trial that she was not "forced" to leave with Young, she testified before the grand jury that she feared for her life if she did not go with him. During the drive to Indiana, Patrick held her head as if in pain and spoke to no one, except to ask for a cigarette on one occasion. When they arrived at Young's apartment, Patrick walked straight into his bedroom with Young close behind. Once inside, Young began beating Patrick with his fists, kicking her, and choking her. This scenario replayed itself off and on over the ensuing two to three hours. On at least one occasion, Patrick called out to Young's friends, who were in the other room, but no one intervened. Patrick did not leave the bedroom that first night.

### B.  January 15-17, 2001

In fact, Patrick went nowhere over the next four days; Young kept her in the apartment, continued to beat her, and threatened to kill her. Young allowed Patrick to go into the bathroom and living room but not to leave the apartment. Patrick was able to phone her employer at some point by sneaking a call with Young's cellular phone, but she did not call the police. She had never been to the apartment and apparently did not know where she was. Young also kept two pit bulls in the apartment, which got loose at one point and forced Patrick to jump behind a stereo speaker for safety.

During these four days, Young's friends apparently continued to stay in the apartment. At one point, Sidney witnessed Young walk out of the bedroom (where Sidney had heard Young beating Patrick) with a gun in his waist-

band. Young asked Sidney to hide the gun for him, but Sidney refused. At trial, Patrick testified that Young never had a gun, but before the grand jury she recounted that he began loading bullets into the gun while in the bedroom and that he struck her in the face with it.

### C. January 18-19, 2001

After four days of abuse, Patrick convinced Young to drive her back to Chicago so that she could sign some papers at work, pick up her paycheck, and see her children. Just as on the trip to Indiana, Young took Sidney and two other friends with him as he drove Patrick back to her grandmother's apartment in Altgeld Gardens. Once inside, Patrick locked the door and called 911, telling the operator that she had been kidnaped for several days and just released. Young banged on the door to gain entry, which the 911 operator heard over the phone. Patrick also made a second call to 911 and gave a description of Young and his van, told the operator that she had been held against her will, and said that Young had a gun.

After calling 911, Patrick called her aunt, Shirley Fields, and pleaded with Fields to come and get her. Patrick told Fields that Young tried to kill her and that she ran from him. Fields could hear Young banging on the door outside and swearing at Patrick. Fields arrived at the apartment shortly thereafter but did not see Young anywhere. Fields found Patrick in her grandmother's apartment with two black eyes, a cut mouth, swelling on her head, and marks on her neck where Patrick said Young choked her. Fields also saw blood all over Patrick's clothing.

Fields took Patrick to nearby Jackson Park Hospital, where Patrick informed the attending nurse and doctor that she had been kidnaped and beaten by Young, including the fact that Young struck her in the face with

a gun. Patrick also told them that she lost consciousness at one point and was forced to have sex. The medical staff noted bruising and tenderness on her head, eyes, forehead, cheek, chin, neck, and back.

That evening FBI agents interviewed Patrick in the hospital and took photos of her injuries. Patrick told them Young forced her to go to Indiana with him, that he beat her, and that she went with him because she thought he had a gun by the way he held his hand in his pocket. She also informed them that he threatened her with the gun while in Indiana on several occasions and hit her in the face with it. Police officers found Sidney that evening and interviewed him as well. Sidney later told Young of the interview, at which time Young instructed Sidney not to tell anyone about the gun.

On January 19, 2001, FBI agents went to Young's apartment, but he was not home. Upon seeing the police, Christine Smith, a friend of Young's, called to warn him, and Young subsequently spent the night at her home. The police searched Young's home and recovered forty-three bullets of various calibers but no gun. The next day, Young agreed to sell Smith's boyfriend a gun, and Young had a friend retrieve it from under the tree where Young had hidden the gun.

FBI agents arrested Young on January 22, 2001, finding him hiding between a mattress and a wall in a friend's apartment. Young helped police locate Sidney and the other individuals present during the kidnaping, who were all arrested as well. The two other individuals were released without being charged, and Sidney testified against Young pursuant to a grant of immunity.

### D. Young's Trial

During the trial, the government called Patrick as a witness. As is not entirely uncommon with victims of do-

mestic abuse, she denied most of the allegations against Young and recanted her story about the kidnaping and abuse. Patrick testified that she still loved Young and specifically denied that he threatened her before taking her to Indiana, that he forced her to go with him to Indiana, and that he had a gun. The government then treated Patrick as a hostile witness and introduced her grand jury testimony, in which she affirmed the details recited above about the trip to Indiana, the abuse, and Young's gun.

Patrick's grand jury testimony tracked a written statement prepared during a lengthy meeting with government prosecutors. Before the grand jury, she testified that she had an opportunity to review and correct the statement, which she utilized. The government questioned her from the statement, and following her testimony she affirmed that all of her answers were correct. Patrick also affirmed that her testimony was entirely consistent with her statements to the police, the FBI agents, the medical personnel, the 911 operators, and her aunt.

The government also called Dr. Ann Wolbert Burgess, a psychiatric mental health nurse specializing in crime victims, as an expert to explain Patrick's recantation. Dr. Burgess has more than forty years of nursing experience and holds a doctorate in nursing science as well as both master and bachelor of science degrees. She is a Professor of Nursing at Boston College and has written, among other things, over 114 articles in various professional journals and publications on topics including forensic nursing, rape, and domestic violence. Dr. Burgess was also the chair of a group from the National Research Council Institute of Medicine that prepared a book at Congress' request entitled *Understanding Violence Against Women*.

Young objected to Dr. Burgess' testimony, but following a full *Daubert* hearing, the court ruled that Dr. Burgess could testify. The doctor stated that victims of domestic violence commonly recant their accusations and that victims of such abuse have a limited ability to perceive means of escape. She also testified that Patrick exhibited this not uncommon behavior pattern. In forming her opinion, Dr. Burgess had reviewed FBI reports, Chicago Police Department reports detailing various confrontations between Patrick and Young, Patrick's grand jury testimony, the Order of Protection Patrick obtained against Young, the criminal history report on Young, letters between Young and Patrick, the defense counsel's notes of an interview with Patrick, and recordings of telephone conversations between Young and Patrick while Young was in pre-trial detention. Dr. Burgess also spent over an hour interviewing Patrick personally.

During deliberations, the jury sent a question to the district judge asking for clarification on the meaning of "during" with respect to count 3's charge of unlawfully using or carrying a firearm during and in relation to the commission of a crime of violence on or about January 14, 2001, in contravention of 18 U.S.C. § 924(c)(1)(A). With respect to this count, the court originally instructed the jury that the government must prove the following beyond a reasonable doubt: 1) that Young committed the crime of kidnaping as charged in count 1 or the crime of interstate domestic violence as charged in count 2; and 2) that on or about January 14, 2001, Young knowingly used or carried a firearm during and in relation to the offense charged in counts 1 or 2.

The jury sent the following question to the district judge during deliberations:

> Dear Judge Pallmeyer: We, the jury, would like further clarification of the terms "during" and "in relation

to," the second part of Count 3. We, the jury, agree on the first part of Count 3. However, there has been much discussion on when "during" begins and ends.

Question: If a person is convicted of interstate domestic violence, does the "during" begin when the defendant crosses state lines or does that time frame begin when the violence first occurs in Michigan City, Indiana? Thus, when does it end?

Young asked that the jury be referred to the already given instructions, while the government and district judge felt a clarification was necessary. The court, accordingly, sent the following written clarification to the jury: "Dear Jurors: 'During and in relation to the offense charged in Counts 1 or 2' means at any point within the offense conduct charged in Counts 1 or 2."

The jury ultimately acquitted Young of the kidnaping charge in count 1 but convicted him of the charges in counts 2 and 3. In a special interrogatory on count 2, the jury stated that it did not find beyond a reasonable doubt that Young "used" a dangerous weapon in connection with the interstate domestic violence charge.[1] The district court, thus, sentenced Young to consecutive, five-year prison terms, for a total of ten years. Young appeals the district court's decision to admit the expert testimony of Dr. Burgess as well as Patrick's grand jury testimony. Young further appeals the sufficiency of the evidence on his conviction for use of a firearm during and in relation to a crime of violence and the district court's supplemental instruction in response to the question from the jury.

---

[1] The court submitted this special interrogatory to the jury pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because an affirmative answer to the special interrogatory could have increased Young's maximum sentence from five to ten years under 18 U.S.C. § 2261(b)(3), (4).

## ANALYSIS

### A. *Expert Testimony on Patterns Among Domestic Abuse Victims*

We review the district court's implementation of the *Daubert* framework with respect to the admission of expert testimony *de novo*. Once we are convinced that the district court properly applied the *Daubert* framework, however, we review the decision to admit or exclude the expert testimony for an abuse of discretion. *United States v. Allen*, 269 F.3d 842, 845 (7th Cir. 2001).

According to Rule 702 of the Federal Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a properly qualified expert may testify as to their opinion on the matter. FED. R. EVID. 702. That testimony must also be based on sufficient facts, be the product of reliable principles and methods, and reflect reliable application of those methods to the facts. *Id.* It is the job of the district court to ensure that the expert's opinion is reliable and relevant to the case, and thus, the district court is given broad discretion to do so. *Allen*, 269 F.3d at 846.

Young does not argue that the district court improperly qualified Dr. Burgess as an expert witness. We must determine, therefore, whether the methodology used by Dr. Burgess to arrive at her opinions was reliable and relevant to this case. Young argues that Dr. Burgess' methodology was not reliable because: a) Dr. Burgess formed her opinion before meeting with Patrick; b) Dr. Burgess reached her conclusion about Patrick based upon "anecdotal" evidence of other battered women; and c) Dr. Burgess did not interview Patrick's friends and family.

The Supreme Court laid out several factors in *Daubert* that serve as a starting point for determining whether an expert's opinion is based upon reliable methodology.

*Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993). The Court later made clear in *Kumho Tire*, however, that "the factors [*Daubert*] mentions do *not* constitute a 'definitive checklist or test.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (emphasis in original); *see also United States v. Conn*, 297 F.3d 548, 555-56 (7th Cir. 2002). Thus, the *Daubert* inquiry must be connected to the particular facts of the case. *Kumho Tire*, 526 U.S. at 150; *Conn*, 297 F.3d at 555-56.

Among the factors to consider, the expert witness's experience in a particular field is often quite relevant in determining the reliability of her opinion. *See Conn*, 297 F.3d at 556. In *United States v. Allen*, this Court upheld the admission of expert testimony in a drug trafficking case by a police officer with twenty-six years of experience, thirteen of which were with the DEA. *Allen*, 269 F.3d at 846. The expert in that case based his opinion not only on his extensive experience investigating over 200 drug cases but also on a full examination of the relevant police reports. *Id.*

Beyond considering the reliability of the expert's opinion, we must also examine its helpfulness to the jury. FED. R. EVID. 702. On this issue, two cases from our sister Circuits are most enlightening and highly relevant. In *United States v. Alzanki*, the First Circuit upheld the defendant's conviction for holding and conspiring to hold a household employee in involuntary servitude. *United States v. Alzanki*, 54 F.3d 994, 1009 (1st Cir. 1995). In so holding, the court also affirmed the admission of expert testimony by the same Dr. Burgess who testified in Young's case, deeming it helpful to the jury. *Id.* at 1005-06.

As in Young's case, Dr. Burgess based her testimony in *Alzanki* on the patterns abuse victims generally exhibit and whether the victim in that case exhibited those patterns. *Id.* at 1006. The court noted that Dr. Burgess'

expertise focused on victims of sexual abuse but that she also researched comparable behavior in victims of non-sexual abuse in "unequal power" relationships (i.e.—battered spouses and children). *Id.* The First Circuit reviewed the admission of Dr. Burgess' testimony under an abuse of discretion standard, as we do here, and concluded that her testimony "was 'reasonably likely' to assist the jury in understanding and assessing the evidence, in that the matter at issue was highly material, somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors." *Id.*

Similarly, in *Arcoren v. United States*, the Eighth Circuit affirmed the admission of expert testimony on "battered woman syndrome." *Arcoren v. United States*, 929 F.3d 1235, 1241 (8th Cir. 1991). Like Patrick, the victim in *Arcoren* recanted her allegations of rape and abuse after describing her ordeal to police, medical professionals, and investigators and testifying to those events before a grand jury. *Id.* At the trial four months later, the victim stated that she did not remember her statements before the grand jury and that she fabricated those statements she could remember making. *Id.* The government in *Arcoren*, as in *Alzanki*, called an expert psychologist who worked with battered women for ten years and with rape victims for fourteen years. *Id.* at 1239.

In affirming the admission of the expert testimony, the Eighth Circuit noted that a "jury naturally would be puzzled at the complete about-face [the victim] made, and would have great difficulty in determining which version of [the victim's] testimony it should believe. If there were some explanation for [the victim's] changed statements, such explanation would aid the jury in deciding which statements were credible." *Id.* at 1240. The court then discussed how the expert testimony, strikingly similar to that offered by Dr. Burgess in both *Alzanki* and Young's

case, provides the explanation a jury needs in order to properly weigh the victim's trial testimony. *Id.*

Before this Court, Young initially argued that Dr. Burgess' methodology was unreliable because she arrived at her conclusion before interviewing Patrick. To support this argument, he points only to testimony from his expert witness that failing to interview Patrick first is not sound. The jury, however, is free to credit whichever witness it sees fit. *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999) Obviously, the jury did not find Young's expert persuasive, and it is not within the province of this Court to determine otherwise. *Id.*

Young also argues that *Clark v. Takata Co.*, 192 F.3d 750 (7th Cir. 1999), demonstrates that the district court abused its discretion by admitting Dr. Burgess' testimony because she arrived at her conclusion before interviewing Patrick. *Clark*, however, is inapposite, as it dealt with whether or not the proffered expert merely assumed the fact he was being called to prove. *Clark*, 192 F.3d at 757. In this case, not even Young disputes that he beat Patrick for years. The government did not offer Dr. Burgess as an expert on whether or not Young abused Patrick, but rather, as an expert on how victims such as Patrick typically respond to such abuse. Furthermore, there is no legal authority supporting the proposition that Dr. Burgess must interview Patrick before forming her expert opinion.

Young's final two arguments are as futile as the first. Next, he claims that Dr. Burgess' methodology was based upon "anecdotal" evidence of other battered women; and finally, he argues that her methodology was unsound because she did not interview Patrick's friends and family. As for "anecdotal" evidence, Dr. Burgess is a highly qualified psychiatric mental health nurse with over forty years of experience. She specializes in crime victims and has published well over 100 scholarly articles and other

writings on forensic nursing, rape, and domestic violence. Her work is generally accepted in the mental health profession. Even Young's own expert agreed with Dr. Burgess that abuse victims often recant their statements to protect their abusers. Dr. Burgess' background makes it clear that she based her opinion in this case on her extensive nursing experience as well as her academic research on several hundred battered women. *See Allen*, 269 F.3d at 846 (relying, in part, on experience of police officer to affirm admission of expert testimony).

Furthermore, Dr. Burgess reached her opinion after conducting a thorough and full examination of the facts in this case. We noted above the substantial evidence Dr. Burgess reviewed in forming her opinion, including police and medical reports as well as communications between Patrick and Young. *See id.* (noting expert's reliance on police reports). And, lest we forget, Dr. Burgess also spent over an hour interviewing Patrick personally. To assert that Dr. Burgess' opinion was based on "anecdotal" evidence is patently inaccurate. That Dr. Burgess did not also interview Patrick's friends and family is of no concern; it seems unlikely that they would disprove the abuse Young dealt out to Patrick for over a decade.

Finally, given Patrick's recantation at trial, we find that Dr. Burgess' expert opinion was helpful to the jury in determining how to credit that testimony. We see no reason to disagree with the First Circuit's conclusion in *Alzanki* that Dr. Burgess' testimony is both reliable and helpful in a case such as this one. The district court did not abuse its discretion in admitting the expert testimony of Dr. Burgess.

In a last-ditch effort, Young argues that Rule 403 of the Federal Rules of Evidence prohibits the introduction of Dr. Burgess' testimony because the prejudicial effect of asserting that Young battered Patrick outweighs the pro-

bative value of her testimony. *See* FED. R. EVID. 403. There is no real issue disputing that Young beat Patrick during the course of their relationship and over the days at issue here. The evidence of the beatings was overwhelming, and Dr. Burgess' testimony was highly probative as to why Patrick recanted on the stand in light of her earlier statements.

### B.  Admission of Patrick's Grand Jury Testimony

Next, we review the district court's decision to admit Patrick's grand jury testimony under Rule 801(d)(1)(A) for an abuse of discretion. *United States v. Williams*, 737 F.2d 594, 608 (7th Cir. 1984). Rule 801(d)(1)(A) of the Federal Rules of Evidence provides that a statement is not hearsay if the declarant testifies at trial, is subject to cross-examination concerning the statement, and the statement is "inconsistent with the declarant's [trial] testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." FED. R. EVID. 801(d)(1)(A). Young does not dispute that Patrick testified at his trial, nor that she was subject to cross-examination by defense counsel. It is equally obvious that Patrick's trial testimony was inconsistent with her grand jury testimony. Indeed, Patrick recanted her allegations of abuse against Young while on the witness stand at his trial; what is commonly referred to as a turncoat witness. *See United States v. DiCaro*, 772 F.2d 1314, 1322 (7th Cir. 1985). Finally, the grand jury testimony satisfies the requirement that the prior inconsistent statement be given under oath. *Id.*

Young's primary argument, however, is that the district court improperly limited his cross-examination of Patrick by prohibiting him from impeaching her grand jury testimony with hearsay statements she made the day after she testified before the grand jury. He also submits that the

district court abused its discretion in admitting Patrick's grand jury testimony under Rule 801(d)(1)(A) because it violated the Confrontation Clause of the Sixth Amendment and was unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. None of these arguments prevail.

First, Young agrees that Patrick was subject to cross-examination at his trial and that cross-examination surely took place. His complaint is that the district court improperly limited this cross-examination because it prevented him from impeaching the government's impeachment of Patrick by eliciting statements she made to a defense investigator the day after her grand jury testimony. Apparently, Patrick told Young's investigator that the trip to Indiana was "no kidnaping." The statement, however, did not impeach any of Patrick's grand jury testimony because Patrick did not actually tell the grand jury that she had been "kidnaped."

We find no abuse of discretion in the district court's ruling. Young had a right to cross-examine Patrick within the rules of evidence, which he fully exercised. Young's proposed impeachment of Patrick's grand jury testimony sought to elicit a legal conclusion from Patrick about whether Young's conduct amounted to the kidnaping charged in count 1. *See United States v. Hach*, 162 F.3d 937, 945 (7th Cir. 1998) (noting that answers in the form of a legal conclusion amount to unhelpful opinion testimony). In the event, Young's attorney brought the sought-after statement into evidence through the investigator. Finally, Young was not convicted of kidnaping under count 1, so that any possible error was harmless.

Young's Confrontation Clause and Rule 403 arguments are likewise without merit. It is well-settled law that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declar-

ant is testifying as a witness and subject to full and effective cross-examination." *California v. Green*, 399 U.S. 149, 158 (1970); *DiCaro*, 772 F.2d at 1326; *Mason v. Duckworth*, 74 F.3d 815, 819 n.3 (7th Cir. 1989).

Finally, Young relies on *United States v. Doerr*, 886 F.2d 944 (7th Cir. 1989), to assert his Rule 403 argument that admission of Patrick's grand jury testimony is unfairly prejudicial. Young argues that the testimony does not contain a long, narrative answer from Patrick and is simply her responses to leading questions from the government that were not subject to cross-examination. He believes this pattern presents a problem because Patrick has limited education and recanted much of that testimony. While *Doerr* does list several factors the court should bear in mind when considering the trustworthiness of out-of-court statements, the case is concerned with hearsay statements being offered into evidence under the catch-all hearsay exception in Rule 807. *Id.* at 955-56. As we stated above, Patrick's grand jury testimony was not hearsay under Rule 801(d)(1)(A), and therefore, *Doerr* is inapplicable here.

### C. Conviction for Use of a Firearm Under § 924(c)(1)(A)

Young's third argument in this appeal is that the government did not prove beyond a reasonable doubt that he "used" a firearm in violation of 18 U.S.C. § 924(c)(1)(A). With a challenge to the sufficiency of the evidence, this Court considers the evidence in a light most favorable to the government and will overturn a conviction only if no rational trier of fact could conclude that the government proved the crime's essential elements beyond a reasonable doubt. *United States v. Jones*, 188 F.3d 773, 776 (7th Cir. 1999); *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999).

Under 18 U.S.C. § 924(c)(1)(A), "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or *carries* a firearm, or who, in furtherance of any such crime, *possesses* a firearm" is subject to various imprisonment terms. 18 U.S.C. § 924(c)(1)(A) (2002) (emphasis added). Young argues that there was insufficient evidence to convict him of this crime because the government did not show, per *Bailey v. United States*, that Young "actively employed" the firearm in connection with the charge of interstate domestic violence in count 2. *See Bailey v. United States*, 516 U.S. 137, 142-43 (1995).

The holding in *Bailey* is not as broad as Young would have this Court believe. The Court in *Bailey* referred only to the meaning of "uses" under § 924(c)(1)(A) and did not address the meaning of "carries" or "possesses" under the statute, which is the issue presented by this case. Thus, we must determine whether Young "carried" a firearm "during and in relation to," or whether he "possessed" one "in furtherance of," the interstate domestic violence charge.

This Court stated in *United States v. Pike* that the "in relation to" prong of § 924(c)(1)(A) may be satisfied "by evidence that the defendant carried his weapon to further the '*purpose or effect*' of his crime." *United States v. Pike*, 211 F.3d 385, 389 (7th Cir. 2000) (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)) (emphasis in original). In Young's case, there can be no doubt that he carried his gun during and in relation to the charge of interstate domestic violence. Witnesses saw him violently confront Patrick at Miller's apartment in Chicago, apparently with something heavy concealed in his pocket. Sidney testified that at least once during the four days Young kept Patrick in Indiana he saw Young exit the bedroom with a gun in his waistband. Young asked Sidney to dispose of the gun, but Sidney refused. Finally, before the grand jury Patrick testified that she told her aunt,

police, and medical personnel that Young had a gun, that he loaded it in front of her, threatened her with it, and struck her in the face with it.

It also goes without saying that Young possessed his gun "in furtherance of" the underlying charge of interstate domestic violence. The events described above all illustrate that he possessed the gun throughout the time he terrorized Patrick and that his possession of the gun furthered the abuse he rendered upon her. Thus, there was ample evidence for a rational jury to conclude beyond a reasonable doubt that Young violated § 924(c)(1)(A), and his conviction for that crime will stand.

### D.   The District Court's Response to a Question from the Jury

We review the district court's decision to answer a question propounded from the jury as well as the language used in the court's response for an abuse of discretion. *United States v. Sanders*, 962 F.2d 660, 677 (7th Cir. 1992). The government urges this Court to review the district court's decision to answer the question for an abuse of discretion, but argues that Young waived this standard with respect to the language of the court's answer and therefore waived the issue on appeal. The government contends that defense counsel did not object to the language of the answer and objected only to the court's decision to give an answer. The record, however, supports that defense counsel adequately objected to both the giving and language of the answer. We will review both issues for an abuse of discretion.

First, Young argues that the supplemental instruction should not have been given, and second, that the judge mislead the jury by defining the terms "during" and "in relation to" jointly. Young contends the joint definition led the jury to believe the terms had similar meanings when,

in fact, they do not. Young also submits that the jury's findings in the special interrogatory submitted on count 2 as well as his conviction under count 3 reveal the confusion stemming from the erroneous instruction.

With respect to Young's first argument, we note that the district court has broad discretion to respond to questions propounded from the jury during deliberations. *United States v. Watts*, 29 F.3d 287, 291 (7th Cir. 1994). When it is clear that the jury is having difficulty with the original instructions, a supplemental instruction is appropriate. *United States v. Lakich*, 23 F.3d 1203, 1208 (7th Cir. 1994). Furthermore, the district court should strive to clear away any difficulties with concrete accuracy. *United States v. Otto*, 850 F.2d 323, 325-26 (7th Cir. 1988) (citing *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)).

Here it is quite clear from the language of the jury's question that it was having primary difficulty understanding the meaning of the term "during" in § 924(c)(1)(A). The district judge decided to respond to the jury's question because the court wished to clear away the confusion with concrete accuracy. We find that the district court did not abuse its discretion in deciding to respond to the jury's question.

When the court issues a supplemental instruction, we examine the language for the following factors: 1) whether the instruction as a whole fairly and adequately treats the issues; 2) whether the instruction is a correct statement of the law; and 3) whether the district court answered the jury's question specifically. *Lakich*, 23 F.3d at 1208. The supplemental instruction at issue stated that "'[d]uring and in relation to the offense charged in Counts 1 or 2' means at any point within the offense conduct charged in Counts 1 or 2." As noted above, the actual question propounded by the jury concerned itself only with the meaning of "during," though the initial paragraph

of the note to the district judge referenced clarification of both "during" and "in relation to." So, the issue here is whether the district judge's inclusion of the term "in relation to" in her supplemental instruction on the meaning of "during" represents an abuse of discretion.

First, the supplemental instruction fairly and adequately treated the issue presented by the jury as it fully considered only the question propounded by the jury. Second, the supplemental instruction provided a correct statement of law. But because the terms "during" and "in relation to" have separate meanings under § 924(c)(1)(A), the district judge should not have included the words "in relation to" in her response to the jury. The inclusion of those words, however, did not mislead the jury with respect to the meaning of "during." As we held above, there was sufficient evidence for a rational jury to find Young guilty of count 3 beyond a reasonable doubt. This verdict was predicated upon the fact that Young carried a gun during and in relation to the interstate domestic violence charge. The "in relation to" prong was satisfied by his carrying the gun to further the purpose or effect of the crime. *Pike*, 211 F.3d at 389. Thus, inclusion of the words "in relation to" in the supplemental instruction defining "during" amounted, at most, to harmless error and does not render the response an incorrect statement of law. Third, it is clear from this language that the supplemental instruction specifically answered the jury's question on the meaning of "during," as it defined a specific time period the jury could consider in its deliberations.

Finally, Young argues that the jury's confusion from this supplemental instruction appears from its finding in the special interrogatory submitted with count 2 (that the government did not prove beyond a reasonable doubt that he "used" a firearm in connection with the interstate domestic violence charge) and his conviction for count 3. First, as we stated above, the § 924(c)(1)(A) conviction rests

upon a finding that Young "carried" the gun during and in relation to the interstate domestic violence charge. The statutory term "uses" in § 924(c)(1)(A) retains an independent meaning from "carries." Young could "carry" the gun without "using" it, and there is no inconsistency in the jury's findings.

And, even if the special interrogatory and the conviction for count 3 were inconsistent, "[a] jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other." *United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2001). In other words, inconsistent verdicts do not invalidate the verdict. *Id.*

Accordingly, we AFFIRM the decision of the district court.

A true Copy:

　　　　Teste:

　　　　　　　　　———————————————————
　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　*Appeals for the Seventh Circuit*