# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 02-2092 & 02-2781

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DONALD SIMS and DAVID LAMBERTSEN,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 01 CR 4—**Robert L. Miller, Jr.**, *Chief Judge.*

_____

ARGUED APRIL 2, 2003—DECIDED MAY 29, 2003

_____

Before BAUER, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Defendants Donald Sims and David Lambertsen of conspiracy to commit mail fraud after acquitting them of the underlying charges of mail fraud. The district court sentenced Sims to fifty-five months' imprisonment and Lambertsen to sixty months' imprisonment and ordered both to pay restitution. Sims appeals only the supplemental jury instruction issued by the district court concerning the proper standard of intent for conspiracy to commit mail fraud. Lambertsen joins Sims in appealing that issue and also appeals the district court's imposition of three sentencing enhancements un-

der the United States Sentencing Guidelines Manual ("USSG")—vulnerable victims (§ 3A1.1(b)(1)); obstruction of justice (§ 3C1.1); and abuse of a position of trust (§ 3B1.3). For the following reasons, we affirm the district court.


## BACKGROUND

Sims' and Lambertsen's association began through business ventures they joined in the Northern Indiana area during the late 1990s, none of which ever became successful. The initial venture was launched by Pat Ballinger and two other individuals in 1995 under the names "Genstar" and "Auto Plus." That program offered a Mastercard credit card to individuals who bought a car from a particular dealer. After that venture failed, Ballinger, Sims, and Lambertsen created "Dealer Direct," a program aimed at securing investments primarily from elderly clients through brokers in Ohio. The brokers induced victims, to whom the brokers had often sold medicare or nursing home insurance, to invest in so-called nine-month promissory notes issued by Dealer Direct.

In the course of defrauding these investors, Dealer Direct and its officials made false and materially misleading statements, orally, and in writing that passed through the United States mail. The notes were designed to look impressive and to resemble an insurance document or a stock certificate; in fact, they were nothing of the kind. Sims' and Lambertsen's signatures, along with other Dealer Direct officials' signatures, appeared on the notes. The notes falsely represented that they were insured by specific car titles or loans, a coalition of major insurance companies, and United States Treasury bonds. The notes purported to pay the investor eleven and one-half percent interest at the end of nine months. Investors also had the option of renewing the investment with a new promissory note at that time.

Dealer Direct raised money from new investors to pay interest to old investors, and corporate officials used investor money for payroll and operating expenses as well as personal gain. Sims brought in the initial investors, and new investors were hand-picked by brokers in Ohio because they had savings accounts, were less sophisticated, and made "an easier sale." In fact, seventy-nine percent of the investors were over the age of seventy, some with health problems and some residing in assisted-living facilities. The brokers told investors that their money was safe and that the investment was a "sure thing." Some victims even fell for the scheme more than once.

Sims joined Genstar in early 1997, after being recruited by Ballinger because Sims represented that he had several insurance clients who might be good candidates for the nine-month promissory notes. Lambertsen joined the business in the fall of 1997, eventually succeeding Ballinger as President of the company in July or August of 1998. Prior to joining Dealer Direct, Lambertsen understood that Ballinger's previous business venture (Genstar) had been shut down because it failed. As the President of Dealer Direct, Lambertsen possessed hiring and firing power and maintained the company's financial records. He established a new bank account for the company, giving Sims and others access to the account.

When he took over as President, Lambertsen was aware of the manner in which brokers in Ohio solicited investments from elderly victims. He and Ballinger met with three brokers, Dixie Grinnell and Alan and Wiley Welton, approximately every two weeks to report on the financial condition of the business. The brokers, of course, earned a commission for each sale of a nine-month note. Lambertsen claimed that he made the brokers aware of the lack of insurance and security for the notes and that he was attempt-

ing to obtain financing to pay all of the notes.[1] As part of that effort, Lambertsen purchased stock with investor money without disclosing the purchase to investors. When called as a witness for Lambertsen, however, Grinnell testified that Lambertsen never directed her to inform investors of the risk and that had she known the business was floundering, or that the investment brochure contained false representations, she would not have suggested that her clients invest.

At trial, Lambertsen acknowledged that Dealer Direct's revenues never exceeded its expenses and that the business was clearly floundering by late 1997. In fact, the business closed its doors in December 1998, shortly after Lambertsen stepped down as President. Lambertsen, however, continued to solicit and receive investors' money by issuing promissory notes as late as April 30, 1999, well after the business was defunct.

In February 2001, a grand jury returned a forty-nine count indictment against Sims, Lambertsen, Ballinger, and Michael Kline, another Dealer Direct employee. Sims and

---

[1] On cross-examination, the following exchange took place between Lambertsen and the prosecution regarding the fraudulent brochures:

| Lambertsen: | I instructed both Dixie Grinnell and Alan Welton to not distribute that material, that sales material. |
| Prosecutor: | Okay. And did you also tell her, "Oh, and by the way, tell the investors that what we're doing with the money is very risky?" |
| Lambertsen: | Yes, I did tell her that, *in so many words.* |
| Prosecutor: | You told Dixie Grinnell, "Tell your investors this is risky." Is that your testimony? |
| Lambertsen: | Yes, it is my testimony. |

(emphasis added).

Lambertsen were each charged with multiple counts of mail fraud, and aiding and abetting therein, in violation of 18 U.S.C. §§ 1341 and 1342, while all four were charged with conspiracy to commit mail fraud, and aiding and abetting therein, in violation of 18 U.S.C. §§ 371 and 372. Ballinger and Kline reached plea agreements with the government and testified against Sims and Lambertsen.

The trial in the district court took place in early November 2001, with final jury instructions being issued to the jury on November 13, to which neither Sims nor Lambertsen objected. During deliberations, the jury propounded three questions to the district court. One question raised an issue regarding the proper standard of intent that the government must prove in order to convict Sims and Lambertsen of conspiracy to commit mail fraud. Noting that intent to defraud must be proven to convict on the underlying charges of mail fraud, the jury asked, "[I]s the intent to defraud also a proposition the government must prove in the charge conspiracy to commit mail fraud?"

Sims's counsel urged the district court to reply in the affirmative and objected to the district court's decision to reiterate and expand slightly on the initial instruction. Lambertsen's counsel, however, made no objection to the supplemental instruction. The district court responded to the jury's question by redefining a conspiracy, reiterating the elements of conspiracy to commit mail fraud from the final jury instructions, and heavily emphasizing that the jury should give equal consideration and weight to each instruction and that no single instruction was more important than the others.[2]

---

[2] Specifically, the district court stated the following:

> In an attempt to answer your question, I'm going to focus on one of the instructions. And in doing that, I want to be sure
> (continued...)

The jury finished its deliberations and returned not guilty verdicts for Sims and Lambertsen on the underlying mail fraud charges but convicted them of conspiracy to commit mail fraud. Sims and Lambertsen immediately moved for new trials arguing that the district court's supplemental instruction was erroneous. The district court acknowledged Sims' earlier objection to the supplemental instruction but denied both requests for a new trial. The court later sentenced Sims to fifty-five months' imprisonment, followed by

---

[2] (...continued)

that you understand that all of these instructions are equally important. No one instruction is more important than others, and you may find other instructions bear upon the answer to your question.

* * *

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. In this indictment, the unlawful purpose alleged is that of mail fraud. . . . To sustain the charge of conspiracy with respect to either defendant, the government must prove the following propositions with respect to that defendant. First, that the conspiracy existed. And that means the conspiracy to commit mail fraud alleged in the indictment. Government must prove that the conspiracy existed. Second, that the defendant knowingly became a member of the conspiracy with an intention to further that conspiracy, that conspiracy being conspiracy to commit mail fraud alleged in the indictment. And third, that an overt act was committed by at least one conspirator in furtherance of that conspiracy.

Again, I repeat that all of the instructions are equally important. None is more important than any other. I have focused on [the conspiracy to commit mail fraud instruction] because I think that's the best—the best I can do to answer your question, to focus on that. But please bear in mind that all of the instructions that you have received are equally important.

three years of supervised release, and ordered him to pay $2,063,024.15 in restitution and a $100.00 special assessment. The district court then sentenced Lambertsen to sixty months in prison, followed by three years of supervised release, and ordered him to pay $1,521,801.30 in restitution and a $100.00 special assessment. In sentencing Lambertsen, the district court applied three enhancements under the USSG—1) vulnerable victims under § 3A1.1(b)(1), 2) obstruction of justice under § 3C1.1, and 3) abuse of a position of trust under § 3B1.3. This appeal ensued.

## ANALYSIS

### A.  Supplemental Jury Instruction

The first issue we consider is whether the supplemental instruction was proper. When a defendant objects to the issuance of such an instruction, we review the district court's decision for an abuse of discretion. In the absence of an objection, our review is limited to plain error. *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2002); *United States v. Skidmore*, 254 F.3d 635, 639 (7th Cir. 2001); *see also* FED. R. CIV. P. 51 (2003) ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."). The plain error standard is designed to correct particularly egregious errors that would amount to a miscarriage of justice, implying that the defendant would not have been convicted but for the error. *Skidmore*, 254 F.3d at 639. Because Sims objected to the language of the district court's supplemental instruction, we will review his claim for an abuse of discretion and review Lambertsen's claim for plain error.

We have held that the district court retains broad discretion in deciding how to respond to a question propounded

from the jury and that the court has an obligation to dispel any confusion quickly and with concrete accuracy. *Young*, 316 F.3d at 661. Issuing a supplemental instruction to the jury is an acceptable means of addressing jury confusion. *Id.* When examining the appropriateness of the language in a supplemental instruction, we consider: 1) whether the instruction as a whole fairly and adequately treated the issue; 2) whether the supplemental instruction was a correct statement of law; and 3) whether the district court answered the jury's question specifically. *Id.* at 662.

Here, the jury specifically sought clarification of the proper standard of intent for conspiracy to commit mail fraud. Neither Sims nor Lambertsen objected to the district court's decision to issue a supplemental instruction. Sims objected only to the language of the instruction; Lambertsen made no such objection and agreed to the language of the supplemental instruction.

In framing the language, the district court did not abuse its discretion in choosing not to instruct as Sims urged. Conspiracy to commit mail fraud requires that the government prove these elements: 1) that the conspiracy to commit mail fraud existed; 2) that the defendant became a member of the conspiracy to commit mail fraud with an intention to further that conspiracy; and 3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy to commit mail fraud. *See United States v. Shelton*, 669 F.2d 446, 450-51 (7th Cir. 1982);[3] *United States v. Craig*, 573 F.2d 455, 486 (7th Cir. 1977).

---

[3] We also note that *Shelton* demonstrates that it must also be reasonably foreseeable that the mails will be used in furtherance of the conspiracy. *Shelton*, 669 F.2d at 451. Here, there is no argument that Sims and Lambertsen contemplated using the mails to further this conspiracy.

The supplemental instruction was not an abuse of discretion for two reasons. First, the court addressed the exact question propounded by the jury and carefully reminded the jury that each instruction was important and that no single instruction should be considered in isolation, thereby fairly and adequately treating the issue as a whole. Second, the supplemental instruction correctly stated the legal standard of intent for conspiracy to commit mail fraud. Which, of course means that there was no plain error in giving the instruction. Accordingly, neither Sims nor Lambertsen prevails on this issue.

### B. Vulnerable Victims Enhancement

The second issue is whether the district court committed clear error by imposing a sentence enhancement under USSG § 3A1.1(b)(1) because Lambertsen defrauded "vulnerable victims." We review the district court's factual determination that Lambertsen's victims were vulnerable within the meaning of § 3A1.1(b)(1) for clear error. *United States v. Rumsavich*, 313 F.3d 407, 411 (7th Cir. 2002); *United States v. Parolin*, 239 F.3d 922, 926 (7th Cir. 2001). Section 3A1.1(b)(1) provides for a two-level increase in the defendant's sentence if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." USSG § 3A1.1(b)(1) (2003).

Application Note 2 to § 3A1.1 provides that,

> [f]or purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

USSG § 3A1.1, cmt. n.2. The government need only establish that a single victim was vulnerable in order for the

enhancement to apply. *Parolin*, 239 F.3d at 926. Further, no other factor need accompany age so long as the victim's vulnerability is related to the victim's age. *See United States v. Williams*, 258 F.3d 669, 672-73 (7th Cir. 2001). Elderly victims satisfy the requirements of § 3A1.1(b)(1), especially when their financial investments and financial security are at issue. *See United States v. Seward*, 272 F.3d 831, 841 (7th Cir. 2001); *United States v. Stewart*, 33 F.3d 764, 770-71 (7th Cir. 1994); *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994).

There is no doubt that age was central to Lambertsen's scheme to defraud investors in Dealer Direct; as the district court aptly found, many of the victims were in the "twilight of their lives." In fact, seventy-nine percent of the victims were over the age of seventy and some resided in assisted-living facilities. Lambertsen admitted that Dealer Direct's brokers chose their victims, many of whom they had previously sold medicare or nursing home insurance, because they had savings accounts, were less sophisticated in financial matters, and "made an easier sale." These victims were often induced to invest money earmarked for retirement purposes, and this fact was known to Lambertsen. The district court did not commit clear error by applying the § 3A1.1(b)(1) enhancement to Lambertsen's sentence because his criminal conduct targeted vulnerable victims.

### C. Obstruction of Justice Enhancement

Next, we consider whether the district court properly applied a sentence enhancement to Lambertsen under USSG § 3C1.1 for obstruction of justice. As before, we review the application of this enhancement for clear error. *United States v. Griffin*, 310 F.3d 1017, 1022 (7th Cir. 2002). USSG § 3C1.1 authorizes a two-level enhancement if the defendant wilfully obstructs or impedes the administration of justice during the investigation, prosecution, or sentencing

of a crime and that obstructive conduct is related to the offense for which the defendant was convicted. USSG § 3C1.1 (2003). Application Note 4 to § 3C1.1 provides that this enhancement is intended to apply, *inter alia*, to "committing, suborning, or attempting to suborn perjury." USSG § 3C1.1, cmt. n.4.

This Court has, therefore, held that the obstruction of justice enhancement can be applied to defendants who commit perjury on the witness stand. *United States v. Jefferson*, 252 F.3d 937, 942-43 (7th Cir. 2001); *United States v. Robinson*, 30 F.3d 774, 787-88 (7th Cir. 1994). A defendant perjures himself if he " 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.' " *Jefferson*, 252 F.3d at 942-43 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). If the defendant objects to the application of this enhancement, the district court must make a specific finding that the defendant committed perjury. *Robinson*, 30 F.3d at 787-88.

In Lambertsen's case, the district court specifically found that Lambertsen committed perjury by wilfully providing false testimony concerning statements he made to Dixie Grinnell. At trial, Lambertsen testified that he told Grinnell to inform investors that the promissory notes were a risky investment. When called as a witness for Lambertsen, however, Grinnell denied being told that information by Lambertsen. The district court found Grinnell's testimony more credible given her continued use of the fraudulent brochures and the sheer number of investors. The court noted that on cross-examination Lambertsen initially answered that he had given Grinnell the disclaimer "in so many words," but when pressed further, Lambertsen unequivocally responded that he told her to inform investors of the risk.

The court also determined that Lambertsen's testimony was material and a point on which Lambertsen was not

likely to be mistaken or confused. Accordingly, the district court found that Lambertsen wilfully gave false testimony, knowing that he never directed Grinnell to inform investors of the risk. Given those findings and the fact that Lambertsen argues only that the district court should not have believed Grinnell over him, we see no reason to disturb the district court's decision and certainly do not find clear error with the application of the § 3C1.1 enhancement.

### D.  Abuse of a Position of Trust

Finally, we deal with whether the district court properly applied an enhancement to Lambertsen's sentence under USSG § 3B1.3 for abusing a position of trust. Our review of the district court's application of this enhancement is likewise for clear error. *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002). A two-level increase in a defendant's sentence under USSG § 3B1.3 is authorized if he abused a position of public or private trust "in a manner that significantly facilitated the commission or concealment of the [underlying] offense." USSG § 3B1.3 (2003).

Generally, individuals entrusted with professional or managerial discretion constitute persons holding a position of trust because they are subject to significantly less supervision. USSG § 3B1.3, cmt. n.1. We have held that this enhancement applies to defendants who serve as corporate officers, utilize fraudulent documents to induce investors, and employ the corporate form to conduct their criminal activities. *Mabrook*, 301 F.3d at 510; *see also United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993) (applying § 3B1.3 enhancement to president of company, in part, because he acts as agent of client-victims). In *United States v. Mabrook*, the defendant used his position as the owner of a company to lure investors and conceal his fraudulent activities. *Mabrook*, 301 F.3d at 510. The *Mabrook* court also found that the defendant assumed a fiduciary duty to his inves-

tors by virtue of his position as the owner, further occupying a position of trust under § 3B1.3. *Id.*

Lambertsen does not argue that, as the President of Dealer Direct, he did not occupy a position of trust, but only states that he did not utilize that position to facilitate a crime. Given the nature of his power as the President of Dealer Direct, his knowledge of the manner in which brokers chose their victim-investors, his creation of and access to corporate bank accounts, his purchase of speculative stock without investors' knowledge, and his issuance of fraudulent promissory notes as late as April 1999 (well after the business was defunct), there was no clear error in the application of this enhancement to Lambertsen's sentence. Clearly, he abused a position of trust with respect to Dealer Direct's investors in order to facilitate the conspiracy to commit mail fraud.

Accordingly, the decision of the district court is AFFIRMED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*