# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 04-4232, 05-1539

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL E. DANFORD,

*Defendant-Appellant.*

———————

Appeals from the United States District Court
for the Western District of Wisconsin
No. 04-CR-28—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED SEPTEMBER 13, 2005—DECIDED DECEMBER 20, 2005

AMENDED JANUARY 18, 2006

———————

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Daniel E. Danford appeals his convictions on three counts of mail fraud under 18 U.S.C. § 1341 and two counts of interstate transportation of a security taken by fraud under 18 U.S.C. § 2314. Danford argues that the district court abused its discretion in four ways: (1) by denying his motion for mistrial; (2) in admitting evidence under the FRE 803 exception to the hearsay rule; (3) by responding to jurors' questions during their deliberations; and (4) in calculating

restitution. Further, Danford contends that his sentence was unreasonable. We affirm the decision of the district court and find that Danford's sentence was reasonable.

## Background

Danford was the owner of Danford Jewelers, a jewelry store in Madison, Wisconsin. On June 18, 1998, police responded to an alarm at the store, where Danford reported that he had been robbed at gunpoint. Danford told the police that the robber had taken almost all of the store's inventory.

Danford said that early the morning of June 18, 1998, he went to his office alone. Danford's office was located in the same building as Danford Jewelers, but the office was on the second-floor and was not connected to the store. He said that a robber came into his second-floor office and forced him at gunpoint to go downstairs and unlock the store. Danford said that the robber forced him to disarm the alarm system, open the safe, and empty the jewelry from the safe into a bag.

Normally, Danford did not open the store nor deactivate the alarm. A few weeks *prior* to the reported robbery, Danford had asked the store manager to refresh him on how to disarm the alarm because he had lost his password.

After reporting the robbery, Danford filed an insurance claim. The store employees compiled a list of all the stolen items. The final list of stolen items was signed under oath by Danford in front of his attorney, notarized, and then mailed to the insurance company to support his claim.

For reasons not pertinent to this appeal, the insurance company did not pay Danford's claim immediately. After some litigation, in March of 1999 the insurance company finally paid Danford for the entire claim amount, totaling $1,235,464.

Starting about eight months after the claim was paid, during the busy holiday shopping season in November of 1999, Danford began slipping into the store's inventory items that had been reported stolen. When Danford re-introduced these items he did not follow the store's typical inventory procedures. Instead, Danford brought the jewelry back to the store in batches and directed his bookkeeper to put them in inventory. Unlike the standard procedures for new inventory at the store, these batches of jewelry had no accompanying invoices. Moreover, the re-introduced items did not have their *original* inventory tags. Thus, nothing on the jewelry pieces indicated that they had ever been in the store before.

From time to time, as a shareholder of Danford Jewelers, Danford had borrowed money from the company. With the re-introduced batches, Danford gave his bookkeeper a handwritten list (rather than the typical invoice), with dollar amounts listed that Danford had assigned to the pieces himself. Explaining that the items came either from him personally or from a partnership that Danford and his father-in-law had established to buy jewelry at estate sales, he directed the bookkeeper to "trade" the value of the jewelry against the shareholder debt that he owed to the company.

Each time Danford re-introduced a batch of jewelry with the handwritten sheet, the bookkeeper would put the item back into inventory, give it a new number, and then offset the value of each item against the debt that Danford owed to the business. In total, Danford introduced more than $170,000 of the stolen jewelry back into the store and directed his bookkeeper to credit the outstanding debt on his account with the "new" pieces.

During the holiday season of 1999 employees began recognizing that some items previously reported stolen were re-appearing in the store. Some employees started to talk

about these suspicions. Finally, Danford heard about the rumors and called an employee into his office to confront her about the accusations. She explained to an angry Danford that she was not accusing him of robbing the store but rather she was confused as to where the jewelry that had been reported stolen was coming from. Danford lied to his employee and explained that he had bought the jewelry items from the store himself so that the books would look good for the bank.

Danford strung together several other lies to cover-up his scheme. He even went so far as to threaten a goldsmith who was leaving the company, warning him not to say anything about what went on in the store. Eventually, in the spring of 2000, Danford went an extra step and began melting down some jewelry in the store's goldsmith shop after work hours.

In June of 2000, agents executed federal search warrants at both Danford Jewelers and Danford's house. They found several items of jewelry in both locations and found the inventory records at the store. Not remarkably, the items recovered at Danford's home and his store matched the items described on Danford's list of stolen items. Further, at trial, several vendors testified that some of the recovered jewelry carried unique serial numbers or were one-of-a-kind items, making identification of these items as *pre*-robbery pieces easy.

Danford first argues that the district court abused its discretion by denying his motion for a mistrial. He contends that prejudicial evidence was published to the jury and that the district court failed to determine fully what jurors were exposed to that evidence. Further, Danford asserts the district court failed to give a proper curative instruction to the jury regarding the prejudicial information.

We review a district court's denial of a motion for mistrial under an abuse of discretion standard. *United States v.*

*Smith*, 308 F.3d 726, 739 (7th Cir. 2002). Our review is highly deferential because the trial judge "is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000). We will reverse a district court's denial of a mistrial only if "we have a strong conviction that the district court erred." *Id.* The ultimate inquiry "is whether the defendant was deprived of a fair trial." *Id.*

After the prosecutor inadvertently published to the jury a letter containing the prejudicial (but irrelevant) information, defense counsel moved for a mistrial, contending that the mistake prejudiced the entire jury. The district court judge surveyed the jury in an attempt to resolve the problem. The letter was re-published in redacted form and the judge inquired as to whether any of the jurors had read the letter in its entirety. One juror responded that she had read the entire letter; the judge admonished her not to discuss that information with any of the jurors and to disregard its content completely. Further, the judge offered to strike the juror in question and replace her with an alternate juror but Danford declined.

This Court has noted before "that jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *Smith*, 308 F.3d at 739 (citing *Richardson v. Marsh*, 481 U.S. 200, 207-08 (1987)). In this case, we assume no different. The irrelevant information was before the jury for a relatively short period of time (about one minute) and was published during testimony of the prosecution's witness. Additionally, the judge gave a curative and limiting instruction to the jury and even offered to remove the juror who had read the irrelevant information. From this vantage point we see no abuse of discretion on the district court's part when it denied Danford's motion for mistrial.

Danford contends that the district court erred when it admitted hearsay evidence at his trial that was testimonial in nature and violated his Sixth Amendment right to confront a witness under the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36 (2004). We review *de novo* district court rulings that affect a defendant's Sixth Amendment right to confront a witness. *United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000).

At trial, Stephanie Kurka, a former Danford Jewelers employee, testified that approximately two weeks before the robbery occurred she witnessed the Danford Jewelers store manager with Danford talking in front of the store's alarm system. Immediately following that conversation (less than 60 seconds later), Kurka asked the manager what had happened. The manager explained that she was demonstrating to Danford how to disarm the alarm because Danford had lost his password.

While the Court in *Crawford* declined to "spell out a comprehensive definition of 'testimonial,'" it did offer clarifying examples of what testimonial hearsay covers. *Crawford*, 541 U.S. at 68. Testimonial hearsay includes prior testimony from a preliminary hearing or testimony in response to police interrogations. *Id.* When nontestimonial hearsay is offered, however, the Court maintains that a judicial determination of reliability is sufficient. *Id. See also Ohio v. Roberts*, 448 U.S. 56 (1980). The Court further noted that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51.

In this case, the conversation between Ms. Kurka and the store manager is more akin to a casual remark than it is to testimony in the *Crawford*-sense. *Id.* Accordingly, we hold that the district court did not err in admitting this testi-

mony under FED. R. EVID. 803(1), the present-sense impression exception to the hearsay rule.

Danford next argues that the district court abused its discretion when it answered questions posed by the jury during deliberations. The jury sent two questions to the judge seeking clarification of the initial instructions. Danford contends that the district court's answers were inconsistent, and thus served to confuse the jury. He objected to the district court's answer to the jury's first question; the second answer, however, Danford approved.

The Court reviews a district court's response to jury questions for abuse of discretion. *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2000). His "right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue." *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996). Therefore, Danford waived his right to appeal the second answer.

When reviewing supplemental instructions given by a district court to the jury, this Court examines three factors: (1) whether the instructions as a whole fairly and adequately treat the issues; (2) whether the supplemental instruction is a correct statement of the law; and (3) whether the district court answered the jury's questions specifically. *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003); *Young*, 316 F.3d at 662.

The jury specifically sought clarification of whether Danford's scheme had to begin on the date charged in the indictment. In response, the judge issued two instructions telling the jury that the scheme did not have to begin on the date alleged in the indictment. But, the judge explained, before convicting Danford on any specific count, the jury must find that a scheme was in existence at the time of the mailing at issue. This is a correct statement of law. Further, since the jury did not read the answers in a vacuum, when

the supplemental instructions are read together with the original instructions, it is clear that the court did not abuse its discretion in its answers to the jury.

Danford next argues that his case should be remanded for resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005). He contends that his sentence was unreasonable. Under *Booker*, this Court reviews a defendant's sentence for reasonableness. *Id.* at 765-66.

The district court, however, understood the potential problems posed by the Supreme Court's pending *Booker* decision. The district judge proceeded by viewing the Sentencing Guidelines as suggestive rather than mandatory. After determining proper restitution and finding of loss, the district judge sentenced Danford to a 60-month sentence. If the court had followed the Guidelines, it would have sentenced Danford to the statutory range of 70 to 87 months. Danford does not argue that there was any basis for a downward departure.

*Booker* did not precisely define "reasonableness," but it did state that the factors listed in 18 U.S.C. § 3553(a) should guide appellate courts in ascertaining if a sentence is unreasonable. As this Court has held, "Judges need not rehearse on the record all of the considerations that 18 U.S.C. § 3553(a) lists; it is enough to calculate the range accurately and explain why (if the sentence lies outside it) this defendant deserves more or less." *United States v. George*, 403 F.3d 470, 472-73 (7th Cir. 2005).

Here, the district judge found several important factors that led to the sentence she imposed: the substantial loss to the insurance company, Danford's attempts to obstruct justice (which included at least one threat to a witness and false trial testimony), Danford's staging of the robbery, his highly sophisticated and carefully planned course of conduct in planning the scheme, and his prior criminal conduct. Because of the judge's thorough record at sentencing, we

feel a *Paladino* remand is unnecessary. *United States v. Paladino*, 401 F.3d 471, 482-83 (7th Cir. 2005). When these factors are combined with the district judge's use of the guidelines as suggestive rather than mandatory, we find that Danford's sentence is reasonable.

Lastly, Danford challenges the district court's calculation of restitution. According to Danford, the restitution amount should have been between $120,000 and $200,000 based on the jury's post-verdict finding. Instead, the district court awarded restitution equal to the insurer's loss, which was $1,235,464. This Court reviews the district court's calculation of restitution for abuse of discretion. *United States v. Swanson*, 394 F.3d 520, 526 (7th Cir. 2005).

Danford's argument is wrong. As this Court has noted, restitution "is not a criminal punishment but a civil remedy administered for convenience by courts that have entered criminal convictions." *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005). Restitution is determined by the judge using the lower preponderance of the evidence standard. *See Swanson*, 394 F.3d at 526; 18 U.S.C. § 3664(e). As a result, the jury's post-verdict findings were not binding on the district court. A civil remedy included with a criminal judgment does not make it a "penalty of a crime" that must be established by a jury beyond a reasonable doubt. *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000).

In this case, Danford was convicted of mail fraud based on a scheme to defraud. The district court, using a preponderance of the evidence standard, found that Danford staged the robbery as part of an elaborate scheme to defraud his insurance company. The district court determined that Danford ultimately fleeced the insurance company of $1,235,464. Given these findings, we do not believe the judge abused her discretion in setting the restitution amount.

## Conclusion

For the reasons stated above, we AFFIRM Danford's conviction and sentence.


**A true Copy:**

   **Teste:**


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*