# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1863

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID H. SWANSON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 01-83-CR-B/F—**Sarah Evans Barker**, *Judge.*

———————

ARGUED MAY 28, 2004—DECIDED JANUARY 7, 2005

———————

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted the defendant,
David H. Swanson, of wire fraud, money laundering, inter-
state transport of converted funds, and tax evasion stemming
from a complex scheme of financial manipulations through
which Swanson was able to siphon funds for his own per-
sonal use as he assisted large agricultural corporations in
their various acquisitions and investments. On appeal he
challenged the district court's choice of sentencing guide-
lines as well as its calculations for amount of loss, restitution,
and forfeiture. After the parties submitted their initial briefs
to this court, two events altered the landscape of this appeal.

First, the government conceded that the district court used the improper sentencing guidelines and second, the Supreme Court accepted *certiorari* in two cases which question the constitutionality of the current federal sentencing practices allowing judges to enhance sentences based on factual determinations made using the preponderance of the evidence standard. *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 125 S. Ct. 11 (U.S. Aug. 2, 2004) (No. 04-104) and *United States v. Fanfan*, No. 03-47, 2004 WL 1723114 (D. Me. June 28, 2004), *cert. granted*, 125 S. Ct. 12 (U.S. Aug. 2, 2004) (No. 04-105). The parties submitted supplemental briefs as to the applicability of *Booker* and *Fanfan*. Because we agree with both parties that the district court used the improper guidelines, we remand the case for resentencing under the proper guidelines and/or in accordance with the forthcoming United States Supreme Court decisions in *Booker* and *Fanfan*. We also remand for new findings as to the proper amount of restitution and forfeiture.

## I.

David Swanson is a highly-educated businessman who, between 1991 and 2001, held various executive positions at midwestern businesses involved in agriculture. Swanson also dabbled in his own business ventures, seeking to buy and sell companies through various corporate enterprises he created on his own. The government charged Swanson with wire fraud, money laundering, interstate transport of converted funds, and tax evasion stemming from schemes wherein Swanson would convince a large corporation to acquire another company, and then would, in short, skim funds from the transaction for his own personal use.

The indictment provided a lengthy description of four schemes, but alleged executions of the scheme related to only two of these four episodes. The other two were included primarily for context and background.

In the first scheme, Swanson, as a self-employed consultant, approached Archer Daniels Midland (ADM) with the idea of buying Central Soya Corporation—an entity for which he had formerly served as CEO. Swanson billed ADM for $1,358,000 for his work on the acquisition. The indictment charged that this figure included requests for reimbursement of expenses that Swanson did not incur, including a request for $278,000 to the consulting firm of Vickers & Allen, an entity that had no formal existence at the time and did not perform any work.

The second scheme involved Countrymark Cooperative, Inc.'s acquisition of Buckeye Feed Mills, Inc. In 1995, Swanson, through a company he formed, attempted to purchase Buckeye. That initial negotiation failed for lack of financing, but Swanson resurrected the deal by giving his guarantee that he would be personally liable for a $100,000 penalty if the acquisition did not close within sixty days. Shortly thereafter, Swanson accepted a position as chief executive officer of Countrymark and convinced the Countrymark board of directors to purchase Buckeye. The indictment alleged that Swanson claimed and received reimbursement expenses from Countrymark for expenditures Swanson made during his personal efforts to acquire Buckeye and that he again sought payment for services Vickers &Allen did not actually perform.

After the completion of the Buckeye acquisition, Swanson also convinced Countrymark's board of directors to acquire Malta Clayton, an agricultural feed business in Mexico—the third scheme alleged in the indictment. Before the matter had been presented to the Countrymark board, however, Swanson signed an agreement with Malta Clayton obligating Countrymark to purchase Malta Clayton via the Project Explorer Mark II Corporation—an entity for which Swanson was the sole director and one that, at the time, had not been incorporated. Swanson initially informed the

board that Countrymark's share of the acquisition costs would be $5 million. Ultimately and through various routes, Countrymark spent $25 million to purchase Malta Clayton (another corporation, Growmark, contributed $10 million). The actual acquisition cost of Malta Clayton was $31 million. After the acquisition, $4 million dollars remained in Project Explorer Mark II's account, at the defendant's sole disposal. The government alleged that Swanson took $2 million for his personal use. In addition, once again, Swanson submitted invoices from Vickers & Allen.

Finally, in scheme four, the indictment alleged that Swanson unlawfully requested and received reimbursement for expenses he claimed to have incurred when Countrymark sold a portion of its stock in Buckeye. Swanson took the $400,000 facilitation fee generated by the sale and transferred it to a bank account under his exclusive control. Swanson later told the Countrymark board that the $400,000 facilitation fee was being used for expenses on a new project in New York City. When Countrymark attempted to retrieve the $400,000, they found that only $300,000 remained. Swanson claimed that Countrymark owed him $168,557.42 of the funds as reimbursement for various expenses—$113,000 of which he had already received. He directed the treasurer of Countrymark to deposit an additional $55,000 in his personal bank account to make up the difference.

Although count 1 of the indictment described all four schemes, the indictment alleged executions only of schemes three and four—the Malta Clayton acquisition and Countrymark's sale of Buckeye stock. Counts two through eight alleged the transportation of the stolen money from scheme three—the Malta Clayton acquisition—across state lines. Count 9 alleged that Swanson committed wire fraud when he transferred $400,000 from Countrymark to an account he controlled during the commission of scheme four—

Countrymark's sale of Buckeye stock. And counts 10 through 13 alleged the transportation of stolen funds from scheme four across state lines. Counts 14 through 17 charged money laundering incident to scheme three and count 18 charged tax evasion. None of the counts focused on the events involved in fraud schemes one and two described above.

A jury convicted Swanson on all counts on October 10, 2002. Swanson failed to appear for his scheduled sentencing hearing on January 24, 2003. He was apprehended as a fugitive on February 14, and sentenced on March 20, 2003, under the 2001 version of the Sentencing Guidelines.

On appeal, Swanson argued first, that the district court should have enlisted the 1998 United States Sentencing Commission Guidelines Manual rather than the 2001 version; second, that the district court was required to make an independent judgment as to the amount of loss when calculating the sentencing guidelines range and the amount of restitution; and third, that the district court erred by ordering a $54 million forfeiture, arguing instead that Swanson was convicted of laundering only $1.9 million.

Two days prior to the scheduled oral argument on appeal to this court, the government filed a letter of supplemental authority pursuant to Federal Rule of Appellate Procedure 28(j), conceding that the district court should have used the 1998 version of the Sentencing Guidelines Manual because the last count of conviction occurred in 1998 and mail fraud is not considered a continuing offense for purposes of deciding which version of the guidelines to apply. The government further conceded that the error was not harmless because the 1998 version would have resulted in a sentencing range of 121-151 months rather than 151-188 months. The government urged this court to remand the case for the limited purpose of recalculating the sentence pursuant to the 1998 Guidelines.

After argument, the parties submitted briefs on the applicability of *Blakely v. Washington*, 124 S. Ct. 2531 (2004) to the sentencing matters in this case. The government argued that where the jury found a fraud scheme as alleged in the indictment, the jury's verdict covered all of the facts on which the court made rulings for sentencing enhancements. Swanson argued, on the other hand, that pursuant to *Blakely*, his sentence could not be enhanced without a specific jury determination on the amount of loss, and that, in any case, the jury verdict established a loss of no more than $35,000.

We agree with the government's and Swanson's assessment that this case must be remanded to recalculate the sentence. We are not, however, convinced that the remand should be limited to recalculation using the 1998 Guidelines. We remand for recalculation of Swanson's sentence using the 1998 Guidelines or for any recalculation that might be applicable in light of the pending decisions in *Booker* and *Fanfan*, and for further factual findings on restitution and forfeiture amounts consistent with this opinion.

## II.

As the parties and this court are acutely aware, since the time of Swanson's sentencing hearing, the machinery of federal sentencing has been called into question by the United States Supreme Court. In *Blakely v. Washington*, 124 S. Ct. 2531 (2004), the United States Supreme Court overturned a Washington state court criminal sentence first reiterating the holding of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Blakely*, 124 S. Ct. at 2536. It then expanded that holding by concluding that the relevant statutory maximum is not the maximum the judge may impose after finding additional

facts, but rather the maximum a judge may impose without any additional findings. *Id.* at 2537. In other words, the Supreme Court clarified that it is the province of the jury to make the findings of fact that bear upon the length of a defendant's sentence. Following the Supreme Court's decision in *Blakely*, which of course, spoke only to the State of Washington's sentencing scheme, this court held in *Booker*, 375 F.3d at 513, 514, that the reasoning of *Blakely* must also apply to sentences determined under the federal sentencing guidelines—specifically, that it gave Booker the right to have a jury determine how much cocaine he possessed and whether he obstructed justice—two factors upon which the sentencing judge had relied when increasing his sentence. The Supreme Court accepted *certiorari* in the *Booker* case along with a companion case, *United States v. Fanfan*, and the country awaits a final decision from the high court. *United States v. Booker*, 125 S. Ct. 11 (U.S. Aug. 2, 2004) (No. 04-104) and *United States v. Fanfan*, 125 S. Ct. 12 (U.S. Aug. 2, 2004) (No. 04-105). On remand to correct the error in choice of Sentencing Guidelines, Swanson will in all likelihood be standing before the court in a post-*Booker/Fanfan* world. We urge the district court to hold the case for resentencing until our high court has illuminated the process and standards by which criminal defendants should be sentenced. It is true, as the government pointed out in its supplemental briefing, that Swanson failed to make a *Booker*-like argument in the district court, but on remand Swanson may raise a new argument based on statutes or opinions that post-date the original sentencing and are not logically foreclosed by the appellate decision. *United States v. Malik*, 385 F.3d 758, 761 (7th Cir. 2004).

In order to avoid unnecessary successive appeals, however, there are some issues that we will resolve without knowledge of the ultimate outcome in *Booker* and *Fanfan.* These include certain questions regarding the jury's finding of loss, and the lower court's determination of restitution and forfeiture.

If the Supreme Court ultimately determines that Swanson had the right to have the jury determine the amount of loss he caused to his victims, Swanson is correct in his conclusion that the jury did not do so. The jury convicted Swanson on all nineteen counts of the indictment, but never made specific factual finding as to the amount of loss. At most, the members of the jury made a factual finding regarding the minimum amount of loss. For counts one and nine, the jury did not have to find any specific amount of loss. It was enough that the jury found that the defendant had devised and executed a scheme to defraud using wire transmissions. For counts two through eight and ten through thirteen, the jury needed to find only that Swanson received stolen money in the amount of $5,000 or more for each count. To convict on counts fourteen through seventeen the jury had to find that Swanson "laundered" more than $10,000. Counts eighteen and nineteen alleged tax fraud and did not require any specific monetary findings by the jury. The jury returned its verdict form, finding Swanson guilty on each count. (R. at 111). We know, for example, that on count two, the jury found that Swanson received stolen money in the amount of $5,000 or more. *Id.* How much more, we do not know. Swanson now argues that taking the instructions and verdicts together, the maximum amount of loss established by the jury is $35,000. The government, on the other hand, maintains that when the jury rendered a guilty verdict on all counts of the indictment, they were, by necessity, accepting the entire amount of loss alleged in the indictment and submitted into evidence at trial—including the amount of loss described in the background information. The jury verdict form, however, makes clear that the jury never came to any conclusions regarding a specific amount of loss. *Id.*

It is not enough, at any rate, that the indictment contained specific allegations regarding the amount of loss and that the jury convicted on all counts of the indictment. Indictments often contain superfluous background informa-

tion that is not essential to the elements of the charge. Allegations in an indictment that are not essential to prove the crime charged are mere surplusage and need not be proved nor addressed in instructions to the jury. *United States v. Liparota*, 735 F.2d 1044, 1048 (7th Cir. 1984), *rev'd on other grounds*, 471 U.S. 419 (1985); *see also United States v. LaBudda*, 882 F.2d 244, 249-50 (7th Cir. 1989) ("any language in the conspiracy count of the indictment stating that the bonds were in fact stolen is mere surplusage, which the government did not need to prove at trial"); *United States v. Kuenstler*, 325 F.3d 1015, 1022 (8th Cir. 2003), *cert. denied*, 540 U.S. 1112 (2004) (noting that inclusion of an allegation in the indictment that the object of the offenses was the production of fifty or more grams of methamphetamine was not a constructive amendment of indictment, but was merely a superfluous allegation which could be disregarded). It follows, therefore, that we cannot assume that a jury has made any factual findings regarding non-essential elements of a crime merely by finding a defendant guilty of a particular count described in an indictment. In short, should the Supreme Court conclude that a jury must determine the amount of loss for sentencing purposes (including enhancements), we note that this jury's verdict alone does not support the amount of loss determined by the district court below.[1]

The decisions in *Blakely*, *Booker*, and *Fanfan*, however do not affect the manner in which findings of restitution or for-

---

[1] Furthermore, depending on the Court's ultimate conclusion in *Booker and Fanfan*, the district court also may need to reconsider the other sentencing enhancements included in the pre-sentence investigation report (PSI) including the enhancement for the sophisticated means employed during the commission of the crime (U.S.S.G. § 2B1.1(b)(8)(C)), for abuse of a position of trust (U.S.S.G. § 3B1.3)), and for extensive criminal activity (U.S.S.G. § 3B1.1(a)) (R. at 122).

feiture amounts must be made. *See United States v. Messino*, 382 F.3d 704, 713 (7th Cir. 2004); *United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004) (finding restitution order unaffected by *Blakely*); *United States v. Wooten*, 377 F.3d 1134, 1144, n.1 (10th Cir. 2004) (same) *cert. denied*, 125 S. Ct. 510 (2004). This follows logically from our reasoning in *United States v. Vera*, 278 F.3d 672, 673 (7th Cir. 2002) where we determined that forfeiture and restitution orders do "not come within *Apprendi*'s rule, because there is no 'prescribed statutory maximum' and no risk that the defendant has been convicted *de facto* of a more serious offense." We can assume, therefore, that whatever decision the Supreme Court comes to in *Booker* and *Fanfan* will not affect our review of the restitution and forfeiture orders in this case.[2]

Disputes regarding the proper amount of restitution must be resolved by the court using a preponderance of the evidence standard. 18 U.S.C. § 3664(e). We review a district court's calculation of the amount of restitution for abuse of discretion. *United States v. Minneman*, 143 F.3d 274, 286 (7th Cir. 1998). Swanson created a challenging situation for the district court by insisting at trial that, consistent with his continued claim of innocence, he owed no restitution whatsoever to the various victimized companies. Although the burden is on the government to prove loss, a defendant's

---

[2]  We held in *United States v. Patel*, 131 F.3d 1195, 1200 (7th Cir. 1997), that because criminal forfeiture (and consequently restitution) are elements of the defendant's sentence rather than of the underlying crime, the government need only establish its right to forfeiture by a preponderance of the evidence rather than by proof beyond a reasonable doubt. Whether this reasoning survives the court's decision in *Booker* and *Fanfan* remains to be seen and offers yet another reason why the district court would be well-advised to wait and see what the Supreme Court decision brings before resentencing Swanson.

wholly unsubstantiated statements are not enough to counter or even question the court's acceptance of the government's proof of loss as outlined in the pre-sentence investigation report (PSI). *United States v. Sensmeier*, 361 F.3d 982, 989 (7th Cir. 2004). A conundrum arises because, on the one hand we have the defendant's bold objection to the amount of restitution without any specific argument or evidence regarding how the amount should be altered (other than to make it zero). On the other hand, however, the government's proffer of evidence of loss lacked any specific detail or explanation and bears some obvious flaws that shall be discussed in more detail below. Consequently, it was not sufficient to bear the burden of proof.

Unlike a determination of the amount of loss for sentencing purposes, which can include the amount that the defendant placed at risk (*United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998)), a restitution order compensates a victim only for losses it has incurred. *United States v. Genova*, 333 F.3d 750, 761, 762 (7th Cir. 2003). For this reason the district court below had to tease from the complex web of transactions in this case which portion of those transactions represented actual losses to the victims—a task made extraordinarily difficult by the muddled explanation of the details of the transactions of these crimes. For example, from the record we can not comprehend the source of the $2.4 million restitution order to Countrymark. The government's Statement of Significant Facts Concerning Sentencing—the substance of which was largely adopted in the PSI, contains a detailed and complicated chart indicating where funds went during Countrymark's acquisition of Buckeye. We cannot discern from that chart, however, which of those transfers of funds resulted from illegal activity or, more importantly, which of those transfers constituted a loss to Countrymark. (R. at 114, Ex. B). It is similarly futile to attempt to link the other specific amounts found in the PSI's

list of restitution amounts with the numbers incorporated in the narrative description of Swanson's offenses. (R. at 122). Nor should we or the district court have to. It was the government's burden to make those specific connections as part of its burden to prove loss. It is not our responsibility to root through the thousands of pages that make up the record in this case in order to dissect legitimate expenditures from illegitimate, and the amounts placed at risk from amounts lost to the victims. *See Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) (refusing to root through thousands of pages of record to support a litigant's position).

At sentencing, the district court asked the government to justify just one of the many restitution amounts suggested in the PSI—the $1,161,000 for the Buckeye acquisition. (R. at 181, Sent. Trans. at p.45). Although the government presented evidence regarding the amount of each allegedly fraudulent transfer, it failed to explain how these transfers resulted in loss to the victim or whether these transfers were part of the illegal activity. *Id.*[3] The PSI is no more helpful in deciphering these matters. (R. at 122). It was Swanson's position, after all, that at least some (if not all) of the transactions described in the indictment were legitimate business transactions between sophisticated commercial entities. And it is possible, after all, that Countrymark— to name just one victim—received some value by acquiring working, viable businesses or other assets during these commercial transactions. To the extent that the acquisition

---

[3] Furthermore, the government's numbers proffered at the sentencing hearing add up to $1,036,074.41, not $1,161,000 as originally claimed by the government and stated in the PSI. *Id.* This discrepancy of $124,296 gives us little confidence either in these calculations or the other claims for restitution for which there was no explanation by the government at sentencing.

of these commercial entities added value to the respective victims' businesses, that value must be deducted from the restitution award. *See United States v. Shepard*, 269 F.3d 884, 887-888 (7th Cir. 2001) (bilked funds later used by defendant to make improvements to victim's home constituted returned property for purposes of restitution award); *Sensmeier*, 361 F.3d at 989 (noting that defendants had the opportunity (but waived it) to present evidence of the value of property that the victimized business received as part of the scheme as a means of lowering the restitution amount).

Similarly, the restitution statute requires the court to deduct the value of any part of the property that has been returned. 18 U.S.C. § 3663A(b)(1)(B)(i)(II). We cannot be certain that the court considered the $120,000 that was returned to Countrymark in 1997 (R. at 114, Ex. E) nor the $400,000 that Swanson repaid to Countrymark before the return of the indictment (R. at 181, Sent. Tr. at p.72; R. at 122, ¶ 25).

We hesitate to criticize the district court on this point as it was faced with a most complex case involving intricate commercial transactions that Swanson purposefully obfuscated to hide his illicit activity. Nevertheless, we simply cannot determine from the record that Swanson's victims incurred $5,526,392 in losses. And since we must remand this case for application of the proper guidelines, it seems appropriate for the district court to either clarify its reasoning for the amount of restitution chosen or to recalculate the amount of restitution (with the government's aid) verifying the value of loss to the companies victimized by Swanson's actions and subtracting the value of any funds or property returned.

We turn now to the claims regarding restitution's alter ego—forfeiture. Although restitution is loss-based, forfeiture is gain-based. *Genova*, 333 F.3d at 761. We review factual findings regarding forfeiture for clear error and review *de novo*

whether those facts adduced at a forfeiture hearing constitute proper forfeiture. *United States v. Baker*, 227 F.3d 955, 967 (7th Cir. 2000).

At oral argument the government spent a great deal of time discussing the funds Swanson placed at risk in response to questions regarding the forfeiture amount. Including the amount a defendant placed at risk is indeed appropriate when calculating the amount of intended loss for sentencing purposes (see *Lauer*, 148 F.3d at 768), but it is not the standard by which to calculate forfeiture. The criminal forfeiture statute states that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section . . . 1957 [money laundering] . . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1).

It is true that "money does not need to be derived from the crime to be forfeited. It can be forfeited if it is involved in the crime." *Baker*, 227 F.3d at 969. "Clean" money in a bank account, for example, may help to mask the criminal proceeds passing through. *United States v. Trost*, 152 F.3d 715, 721 (7th Cir. 1988). As we have noted before, however, "the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992).

The government relies on *Baker* for the proposition that all funds can be forfeited if they are involved in the criminal scheme. In *Baker*, the district court ordered the defendant to forfeit all of the money and property involved in his illegal prostitution business, and not merely the funds that had passed over interstate wires in violation of federal law. All of the funds from Baker's prostitution business, this court concluded, both the credit card transactions and cash

proceeds, were illegal and part of the money laundering process, and therefore, all of the funds were "involved in" the money laundering conspiracy—not just the specific funds that were proved by the government at trial. *Id.* at 969. In contrast, it is not explicitly clear that all of the funds listed in the government's forfeiture submission in this case were from illegal activity. In fact, as we noted above, Swanson maintains that some of the transactions— or at least some portions of the transactions—were above- board, arm's length sales negotiations between sophisticated companies. For example, Countrymark and Growmark's acquisition of Malta Clayton was not an illegal transaction. Swanson's appropriation of funds for his personal use was. The former legitimate transaction was not "involved in" the illegal activity and Swanson gained nothing from it. And forfeiture is, after all, "gain based." *Genova*, 333 F.3d at 761.

The *Genova*, case illustrates how a district court must focus on a defendant's gains for purposes of calculating for- feiture. *Id.* at 761. In *Genova*, a corrupt Public Works Commissioner paid his employees (via overtime and com- pensatory time) to perform unlawful political services for the crooked mayor of Calumet City, Illinois. *Id.* at 754. This court determined that money that the City paid to employ- ees to perform these unlawful political services was not forfeitable to the mayor who did not receive a penny and thus had no proceeds from the illegal activity, despite the fact that he received some "political capital" from the city workers' time spent on political duties. *Id.* at 762. It is true that *Genova* involved forfeiture under a RICO statute, but the philosophy is no different here. *Genova* makes clear that money that a defendant caused a victim to lose is properly accounted for by an order of restitution; only assets gained by the defendant can be collected via a forfeiture order.

*Genova*, 333 F. 3d at 762.[4] Swanson received no benefit from the $35 million that Countrymark and Growmark used to purchase their respective shares of the Malta Clayton business. He did, however, receive plenty of benefit from the portion of that money that he diverted from that acquisition to his own personal use. The latter funds should have been identified separately for purposes of computing forfeiture.

The defendant argues that the court cannot order a criminal forfeiture of property that does not belong to the defendant. The $31 million that Countrymark and Growmark spent to acquire Malta Clayton belonged to those companies and not to Swanson. This argument is but a variation on the theme discussed above. Those funds actually spent by Countrymark and Growmark to acquire Malta Clayton never became assets in Swanson's hands.

On remand the district court should make specific findings teasing those funds which were "involved in" Swanson's illegal activity (and which constituted a gain to Swanson) from those funds that were not.

In sum, we remand this case to the district court for resentencing in light of the forthcoming United States Supreme Court opinions in *Booker* and *Fanan*. This may or may not involve application of the 1998 Sentencing Guidelines

---

[4] It is worth noting, however, that a change in the form of proceeds obtained from the crime does not prevent forfeiture, provided that the proceeds were involved in the crime as required by 18 U.S.C. §982(a)(1). Section 982(b)(1) allows the government to obtain substitute assets if it cannot find property "involved in" or "traceable to" the offense of conviction. 21 U.S.C. § 853(p) (incorporated into 18 U.S.C. § 982(b)(1) by reference). For example, if Swanson used the funds skimmed from the Malta Clayton acquisition to purchase his home in New York, the home would then be forfeitable as well.

Manual, but will certainly require some recalculation and additional findings on restitution and forfeiture.[5]

REVERSED and REMANDED

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I agree entirely with my colleagues with respect to all substantive matters addressed in the opinion of the court. I also agree that the ultimate disposition of sentencing matters in this case must await the Supreme Court's decisions in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 125 S. Ct. 11 (U.S. Aug. 2, 2004) (No. 04-104) and *United States v. Fanfan*, No. 03-47, 2004 WL 1723114 (D. Me. June 28, 2004), *cert. granted*, 125 S. Ct. 12 (U.S. Aug. 2, 2004) (No. 4-105). I would therefore hold our decision in this case until the Supreme Court decides

---

[5] Our colleague's comment about awaiting the outcome of *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 125 S. Ct. 11 (U.S. Aug. 2, 2004) (No. 04-104) and *United States v. Fanfan*, No. 03-47, 2004 WL 1723114 (D. Me. June 28, 2004), *cert. granted*, 125 S. Ct. 12 (U.S. Aug. 2, 2004) (No. 04-105) for the sake of judicial economy would ordinarily hold sway. In this case, however, the matter must be remanded for reasons unrelated to *Booker* and *Fanfan*—that is to unravel the issues regarding forfeiture and restitution. For this reason judicial economy will be served best by allowing the parties immediately to begin their efforts to clarify the forfeiture and restitution issues for the district court. Furthermore, by remanding this matter now the district court will have the first opportunity to apply the holdings of *Booker* and *Fanfan* while allowing for later appellate review if necessary.

those matters or, in the alternative, I would issue the opinion, but stay our mandate, until those cases are decided and we can give the district court a more definitive ruling on how it ought to proceed in a resentencing proceeding. I can see no judicial economy in placing this case back on the docket of a busy district court until we can say how that court ought to proceed. To this limited extent, I respectfully dissent from the otherwise thoughtful opinion of the court.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of Appeals for the Seventh Circuit*