SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| TOWN OF GILBERT PROSECUTOR'S OFFICE, | ) Arizona Supreme Court<br>) No.  CV-07-0300-PR<br>) |
| Petitioner, | ) Court of Appeals<br>) Division One |
| v. | ) No.  1 CA-SA 07-0078<br>) |
| THE HONORABLE MARGARET H. DOWNIE,<br>JUDGE OF THE SUPERIOR COURT OF<br>THE STATE OF ARIZONA, in and for<br>the County of Maricopa, | ) Maricopa County<br>) Superior Court<br>) No.  LC2006-000817-001DT<br>)<br>) Gilbert Municipal Court |
| Respondent Judge, | ) No.  05TR192310C<br>) |
| MITCHELL MICHAEL MATYKIEWICZ, | )<br>) **O P I N I O N** |
| Real Party in Interest. | ) |

Appeal from the Town of Gilbert Municipal Court
The Honorable John E. Hudson, Judge

**REMANDED**

_____

Special Action from the Superior Court in Maricopa County
The Honorable Margaret H. Downie, Judge

**AFFIRMED**

_____

Opinion of the Court of Appeals, Division One
216 Ariz. 30, 162 P.3d 669 (2007)

**REVERSED**

_____

LYNN R. AROUH, GILBERT TOWN PROSECUTOR                    Gilbert
      By   Denise E. Boode, Assistant Town Prosecutor
Attorneys for Town of Gilbert Prosecutor's Office

LAW OFFICES OF MICHAEL J. DEW                                    Phoenix
     By   Michael J. Dew
Attorneys for Mitchell Michael Matykiewicz

CARON L.B. CLOSE, SCOTTSDALE CITY PROSECUTOR              Scottsdale
     By   Anna C. Johnston, Assistant City Prosecutor
Attorneys for Amicus Curiae City of Scottsdale

AARON J. CARREON-AINSA, PHOENIX CITY PROSECUTOR              Phoenix
     By   Rebecca M. Gore, Assistant City Prosecutor
Attorneys for Amicus Curiae City of Phoenix

_____

**B E R C H**, Vice Chief Justice

¶1      We have been asked to decide whether the amount of restitution to be paid by a defendant convicted of contracting without a license may be reduced by any value conferred on the homeowner.  We hold that such a reduction is appropriate.

## I.  FACTS AND PROCEDURAL HISTORY

¶2      In January 2005, Richard and Felicita Rada hired Mitchell Matykiewicz to perform remodeling work on their home in Gilbert, Arizona.  Over the course of nine months the Radas paid $52,784.22 to Matykiewicz.  Matykiewicz claims to have hired licensed subcontractors to do the work, which included installing a pool, barbeque, and fire pit; moving the hot tub from one location to another; removing bushes, tree stumps, and gravel from the back yard; raising and painting the walls all around the house; performing interior remodeling work, such as moving sinks and installing doors; and obtaining the required permits from the Town of Gilbert.

- 2 -

¶3     Mr. Rada discovered that Matykiewicz was not properly licensed and filed a complaint with the Registrar of Contractors. The Town of Gilbert charged Matykiewicz with contracting without a license in violation of Arizona Revised Statutes ("A.R.S.") section 32-1151 (2008).[1] The municipal court convicted Matykiewicz and, based on its reading of *State v. Wilkinson*, 202 Ariz. 27, 39 P.3d 1131 (2002), ordered him to pay restitution of $52,784.22, the entire amount the Radas had paid. The court also placed Matykiewicz on probation and imposed a fine of $1855.

¶4     On appeal, the superior court vacated the restitution order. Concluding that *Wilkinson* decided only whether damages for incomplete or faulty work were recoverable as restitution, the superior court remanded the case for a determination of the Radas' economic loss.

¶5     The court of appeals accepted jurisdiction of the Town of Gilbert's petition for special action, granted relief, reversed, and, over a dissent, reimposed the $52,784.22 restitution order. *Town of Gilbert Prosecutor's Office v. Downie*, 216 Ariz. 30, 35, ¶ 19, 162 P.3d 669, 674 (App. 2007). The majority held that *Wilkinson* requires disgorgement of "all

---

[1]     Unless otherwise indicated, we cite the current version of the applicable statutes, as they have not been changed since the criminal conduct occurred.

payments made by victims to an unlicensed contractor under a contract." *Id.* at 34, ¶ 14, 162 P.3d at 673. This amount, it concluded, "constitute[s] economic loss subject to restitution." *Id.* The majority noted that, while the result seems harsh, such a restitution order would help deter unlicensed contractors. *Id.* at 34-35, ¶¶ 16-17, 162 P.3d at 673-74. The dissent countered that *Wilkinson* did not create a per se rule of disgorgement of all proceeds. Instead, *Wilkinson* held that the trial court could not order as restitution additional sums for consequential damages caused by faulty or incomplete work. *Id.* at 35, ¶ 20, 162 P.3d at 674 (Hall, J., dissenting). The dissent concluded that the restitution inquiry should be guided by general restitution principles. *Id.* ¶¶ 20-21.

¶6 We granted Matykiewicz's petition for review to decide this issue of statewide importance and to clarify our holding in *Wilkinson*. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution.

## II. DISCUSSION

¶7 The Victims' Bill of Rights gives victims the right to prompt restitution for any loss they incur as a result of a crime. Ariz. Const. art. 2, § 2.1(A)(8). Arizona's criminal code implements this constitutional guarantee by requiring "the convicted person to make restitution to . . . the victim of the

crime . . . in the full amount of the [victim's] economic loss." A.R.S. § 13-603(C) (2001).

¶8    In ascertaining the victim's "economic loss," the sentencing court must "consider all losses caused by the criminal offense or offenses for which the defendant has been convicted."  *Id.* § 13-804(B); *see also id.* § 13-105(14) (defining economic loss).  The court must then exclude "damages for pain and suffering, punitive damages [and] consequential damages."  *Id.* § 13-105(14).  The "economic loss" recoverable as restitution thus includes all "losses" the victim incurred as a result of the criminal offense that are not excluded by § 13-105(14).

¶9    In *Wilkinson*, we identified a three-part test for determining which losses qualify for restitution under § 13-603(C).  "First, the loss must be economic.  Second, the loss must be one that the victim would not have incurred but for the defendant's criminal offense."  *Wilkinson*, 202 Ariz. at 29, ¶ 7, 39 P.3d at 1133.  Third, "the criminal conduct must directly cause the economic loss."  *Id.*  In *Wilkinson*, we focused on the third part of the test – whether the defendant's criminal actions directly caused the damages that arose from the unlicensed contractor's "shoddy and incomplete work."  *Id.* at 28-30, ¶¶ 4, 7-13, 39 P.3d at 1132-34.  In this case, we analyze

the first part of the test – how to ascertain "economic loss." We must decide whether, in determining how much "economic loss" a victim has suffered, the court may consider any value conferred on the homeowner. Resolution of this issue is a question of law, which we review de novo. *See State v. Getz*, 189 Ariz. 561, 563, 944 P.2d 503, 505 (1997).

**A. The meaning of "loss"**

¶10    Because statutory language is the best evidence of the legislature's intent, *Mejak v. Granville*, 212 Ariz. 555, 557, ¶ 8, 136 P.3d 874, 876 (2006), we begin by examining the criminal code to find the meaning of the term "loss." Arizona's criminal code defines "economic loss" as "any" or "all" losses, A.R.S. §§ 13-105(14), -804(B), but does not define the word "loss" in the context of restitution.[2] The code similarly does not specify whether a determination of "loss" permits consideration of any benefits conferred on the victim.

¶11    "Loss" is commonly defined as the difference between what was had before and after a specified event. *E.g.,*

---

[2]    The only definition of "loss" in Arizona's criminal code appears in a provision establishing crime victim accounts if defendants sell media rights. *See* A.R.S. § 13-4202 (2001). This definition, which "includes the value of any property damaged, destroyed or taken, the cost of medical treatment or counseling, lost wages and any other damage suffered as a result of the crime," applies only to media rights cases. *Id.* § 13-4202(M).

Webster's College Dictionary 778 (2d ed. 1997) (defining "loss" to mean "the act of losing possession of something" or "an amount or number lost"); *see also* A.R.S. § 1-213 (2002) (requiring that words be given their ordinary meaning). The restitution provisions of the criminal code confirm that the legislature contemplated a similar definition of "loss" as being "out" something as a result of a crime. Section 13-804(E), for example, provides that if a victim receives compensation from a collateral source to cover economic loss caused by criminal conduct, the court must reduce the victim's recovery by that amount. Requiring reduction of a victim's recovery for sums already received demonstrates the legislature's intent that the victim's "loss" reflect benefits conferred. *See Moreno v. Jones*, 213 Ariz. 94, 99, ¶ 28, 139 P.3d 612, 617 (2006) (looking to other provisions in a statutory scheme to assist in determining meaning).

¶12 Consistent with this understanding, Arizona courts credit victims with the value of returned property when considering restitution. *E.g.*, *State v. Ferguson*, 165 Ariz. 275, 277-78, 798 P.2d 413, 415-16 (App. 1990) (concluding that the trial court erred by failing to take into account evidence that stolen property had been returned). The concept that restitution compensates victims only for loss actually suffered

is well established. *See, e.g.*, ABA Standards for Criminal Justice § 18-3.15(c)(i) (3d ed. 1994) (limiting restitution "to the greater of the benefit to an offender or actual loss to identified persons or entities").

¶13 Reducing "loss" by any benefits conferred furthers the restitutory purposes of making the victim whole, *State v. Guilliams*, 208 Ariz. 48, 52, ¶ 12, 90 P.3d 785, 789 (App. 2004); *In re Kory L.*, 194 Ariz. 215, 219, ¶ 10, 979 P.2d 543, 547 (App. 1999), and rehabilitating the offender, *Wilkinson*, 202 Ariz. at 30, ¶ 13, 39 P.3d at 1134; *State v. Iniguez*, 169 Ariz. 533, 536, 821 P.2d 194, 197 (App. 1991). Restitution is not meant to penalize the defendant; that function is served by incarceration, fines, or probation. *See Kory L.*, 194 Ariz. at 219, ¶ 10, 979 P.2d at 547. Restitution therefore should not compensate victims for more than their actual loss. *See generally* George Blum, *Measure and Elements of Restitution to Which Victim is Entitled Under State Criminal Statute*, 15 A.L.R.5th 391, § 2(b) (1993). Courts in other jurisdictions agree. *See, e.g.*, *People v. Fortune*, 28 Cal. Rptr. 3d 872, 874-75 (Cal. Ct. App. 2005); *Maurer v. State*, 939 So. 2d 234, 235 (Fla. Dist. Ct. App. 2006); *State v. Baxter*, 118 P.3d 1291, 1293 (Kan. Ct. App. 2005); *State v. Beavers*, 3 P.3d 614, 616 (Mont. 2000), *overruled on other grounds by State v. Herman*, ___ P.3d

___, 2008 WL 2221908 (Mont. May 29, 2008); *People v. Tzitzikalakis*, 864 N.E.2d 44, 46 (N.Y. 2007).

**¶14** Limiting the victim's restitution to the amount necessary to recompense direct losses comports with the language of the restitution statutes, makes practical sense, and preserves the proper place and function of a civil jury to determine a victim's actual damages, including damages for pain and suffering, punitive damages, and consequential damages. *See* A.R.S. §§ 13-807 (2001) (providing that a restitution order "does not preclude [a victim] from bringing a separate civil action and proving in that action damages in excess of the amount of the restitution order"); 13-804(G) (recognizing that restitution is not a substitute for civil litigation because "[t]he state does not represent persons who have suffered economic loss"); *Wilkinson*, 202 Ariz. at 29-30, ¶ 11, 39 P.3d at 1133-34 (interpreting the restitution statute to avoid a conflict with Arizona's civil jury trial right). To hold otherwise would upset the relationship among reparation, retribution, and rehabilitation, and blur the distinction between criminal restitution and recovery for ancillary damages protected by the civil jury trial. It might also provide a windfall to the victim and encroach into punishment for the defendant.

¶15    Several jurisdictions permit reductions in restitution for value conferred on the victim. *E.g.*, *Beavers*, 3 P.3d at 616 (citing *Bowman v. State*, 698 So. 2d 615, 616 (Fla. Dist. Ct. App. 1997)); *Tzitzikalakis*, 864 N.E.2d at 46. In *Tzitzikalakis*, for example, the defendant owned a construction company that contracted with the City of New York. 864 N.E.2d at 44-45. He pled guilty to crimes stemming from the submission of falsified invoices. *Id.* at 45. The trial court ordered restitution in the face amount of the falsified invoices and excluded evidence showing that the defendant completed some construction work. *Id.* The New York Court of Appeals held that the trial court erred by excluding evidence of "the fair market value of the goods and services [the defendant] provided to the city under the contract." *Id.* at 45-46. The court observed that trial courts "must consider not only the amount taken by [the contractor,] but also the value of any benefit received by the victim." *Id.* at 46; *see also People v. Kom*, 467 N.Y.S.2d 495, 495 (N.Y. App. Term 1983) (requiring reductions for value victims received when determining restitution to be paid by one convicted of performing home improvement work without a license). We find the reasoning in *Tzitzikalakis* persuasive.

¶16    We also find guidance in decisions interpreting the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C.

§ 3663A (2000 & Supp. 2007). Much like Arizona law, the MVRA requires defendants to pay restitution to their victims. *See id.* § 3663A(a)(1). The MVRA defines the amount of restitution to be the value of property "loss" less the value "returned." *Id.* § 3663A(b)(1)(B). Several federal circuits have interpreted "returned" to require reductions in restitution for value conferred on victims. *E.g., United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005); *United States v. Matsumaru*, 244 F.3d 1092, 1109 (9th Cir. 2001).

¶17 In *United States v. Shepard*, for example, the defendant embezzled funds from a hospital patient under the guise of making improvements to the patient's home. 269 F.3d 884, 885 (7th Cir. 2001). The Seventh Circuit concluded that the starting point for determining restitution was the amount embezzled from the victim. *Id.* at 887. From this amount, the court subtracted expenditures made on improvements to the victim's home. *Id.* at 887-88. The court concluded that such expenditures did not differ "in principle from taking the money from one of [the victim's] bank accounts and depositing it in another." *Id.* "[T]he change of the property's form - from cash to, say, central air conditioning –" does not mean the property has not been "returned." *Id.* at 888.

¶18 We agree with the many courts that have concluded that,

when determining the proper amount of restitution to be paid to a victim, consideration should be made for value conferred on the victim.[3]

## B.   *State v. Wilkinson*

¶19     The Town of Gilbert argues and the court of appeals concluded that our decision in *Wilkinson* created a per se rule that the entire amount of consideration paid by the victim in an unlicensed contractor case is the proper amount of restitution, regardless of any benefit conferred on the victim.  We disagree that *Wilkinson* created such a rule.  Although *Wilkinson* also involved the restitution due from an unlicensed contractor, it decided an entirely different issue from the one now facing the court.

¶20     In *Wilkinson*, John Porter was convicted of contracting without a license under § 32-1151.  202 Ariz. at 28, ¶ 3, 39 P.3d at 1132.  Porter had contracted with two homeowners, T.S. and N.L., to perform remodeling work.  *Id.* ¶ 2.  T.S. and N.L. paid Porter $2854.77 and $9040.27, respectively.  *Id.*  At Porter's restitution hearing, the trial court awarded $22,429.11 to T.S. and $22,365.67 to N.L., which it calculated by "adding

---

[3]    The Town of Gilbert has cited no published opinion from any other jurisdiction holding that the entire amount of consideration paid by homeowner-victims must be disgorged as restitution, nor has our research revealed any such authority.

the amounts each victim had paid to Porter to the estimated cost of repairing Porter's faulty work and finishing work he left incomplete." *Id*. ¶ 3.

¶21 This Court concluded that the consideration paid by T.S. and N.L. was the "loss" that flowed directly from Porter's illegal conduct. *Id.* at 29, ¶ 9, 39 P.3d at 1133. Any damages for repairing T.S's and N.L.'s homes or completing the work were not "direct" because those damages required the occurrence of a second causal event unrelated to the criminal activity itself – that is, Porter's faulty and unprofessional performance. *Id.* ¶¶ 9-10.

¶22 Although *Wilkinson* explored the extent to which "courts can order restitution for victims of an unlicensed contractor who performs incomplete and faulty work," *id.* at 28, ¶ 1, 39 P.3d at 1132, and more specifically, whether losses not resulting from criminal conduct are subject to restitution, it never addressed whether losses incurred by victim-homeowners may be reduced by benefits conferred upon them.[4] Because it did not

---

[4] By focusing on payments made by the victim to the defendant, *Wilkinson* did not adopt a per se rule for all unlicensed contractor cases, but instead recognized that a victim must incur a loss to recover any restitution. A defendant can violate § 32-1151 without receiving any payments. *See* A.R.S. § 32-1151 (making it unlawful for an unlicensed contractor to engage in the business of contracting without a license, to submit bids or proposals, to respond to requests for

address the issue before us, *Wilkinson* is not dispositive.[5]

¶23        We recognize the legislature's strong interest in protecting the public from unlicensed contractors, which is evidenced by the onerous requirements for licensure.    The applicant seeking a license must post a bond, obtain experience or train at an accredited institution, and pass a written examination; he may also have to submit fingerprints for a background check.    A.R.S. § 32-1122(B)(2), (F).    Harsh

---

qualification or proposals for construction services, to act or offer to act as a licensed contractor, or to purport to have the capacity of a licensed contractor).  Because the fact of payment is not determinative as to the commission of the offense, it would be anomalous to treat such payments as conclusively establishing a right to restitution in the amount paid.

[5]    Our dissenting colleague asserts that *Wilkinson* governs the result in this case and that principles of stare decisis dictate adherence to it.  We disagree.

Before applying the doctrine of stare decisis, a court must first identify the legal principle entitled to respect.  *E.g.*, Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 957 (2005) (noting that before applying stare decisis, a court "must first determine just what that case purports to establish").  As we explained in paragraphs 19-22, *Wilkinson* simply did not address the issue presented here.

There are good reasons not to over-read *Wilkinson* as holding that a homeowner is entitled to restitution for all amounts paid to an unlicensed contractor regardless of any benefits the homeowner received.  Over-reading a decision can be corrosive to the rule of law because it may lead a court to ignore concerns not present in the earlier case and to embrace conclusions that are contrary to common sense or experience.  This case illustrates this point; treating *Wilkinson* as dispositive could lead to results that are contrary to the language of the restitution statute, which contemplates that victims will recover their losses, not a windfall.

consequences await the unlicensed contractor. Violation of § 32-1151 is a class one misdemeanor, A.R.S. § 32-1164(A)(2), for which incarceration, probation, and statutory fines serve as punishment, *id.* §§ 13-707, 32-1164(B). Conviction may also disqualify the defendant from obtaining a license, § 32-1122(D), (E).[6]

¶24  The State thus already has many tools with which to punish unlicensed contractors. Reading *Wilkinson* to forge another tool - a rule of total disgorgement regardless of any benefit conferred on the victim – would unnecessarily strain Arizona's restitution scheme and may lead to absurd or troubling results.

¶25  Consider, for example, the situation in which an unlicensed contractor obtained $5000 from a homeowner to perform construction work. Under the Town's reading of *Wilkinson*, the unlicensed contractor has committed a crime under § 32-1151 and the homeowner has incurred a $5000 "loss." *See* 202 Ariz. at 29, ¶ 9, 39 P.3d at 1133. Assume further, however, that one day

---

[6]  After Matykiewicz was convicted, the legislature amended A.R.S. § 32-1164 to require unlicensed contractors to pay transaction privilege taxes as a condition of probation. 2007 Ariz. Sess. Laws, ch. 174, § 1 (1st Reg. Sess.). This statute also demonstrates the legislature's understanding that one convicted of contracting without a license may retain some compensation, but must pay appropriate taxes on it.

later the unlicensed contractor decided not to do the job and returned the $5000. To be sure, a crime has still been committed under § 32-1151, but the homeowner has suffered no loss. No reasonable jurist would conclude, and the legislature could not have intended, that the unlicensed contractor must pay $5000 in restitution in addition to the $5000 already returned. Such an outcome would result in a windfall for the victim. The victim would similarly receive a windfall if an unlicensed contractor flawlessly performed all work for which the victim contracted, but then was required to disgorge all payments.[7] We find no significant difference between returning cash, one form of value, and returning other forms of value, such as permits, chattels, services, or other property. *See Shepard*, 269 F.3d at 887-88. "Loss" is a concept rooted in value, not solely in the exchange of money. We thus decline to read *Wilkinson* as creating an inflexible rule of total disgorgement regardless of

---

[7]    The concern has been raised that requiring defendants to pay as restitution the full amount of consideration received for their services may encourage homeowners to knowingly hire unlicensed contractors because upon conviction for contracting without a license, the defendant must refund all payments. *See* A.R.S. § 32-1153 (preventing unlicensed contractors from bringing civil action to recover payment). Such conduct, however, might render the homeowner an accomplice and forfeit the right to restitution. *See State v. Wilkinson*, 198 Ariz. 376, 383, ¶ 36, 10 P.3d 634, 641 (App. 2000) (Ryan, J., dissenting), *overruled by Wilkinson*, 202 Ariz. at 31, 39 P.3d at 1135.

value conferred.

¶26    We are persuaded that determining a victim's "loss" requires consideration of any benefits conferred on the victim. "Most often there will be no reductions, as criminals rarely confer a benefit on their victims." *Tzitzikalakis*, 864 N.E.2d at 47.    If value is conferred, however, courts must consider such benefits in determining a victim's loss.

**C.    Remand**

¶27    On remand, the trial court must determine the amount of the Radas' loss.    While determination of a victim's loss will depend upon the unique facts of each case, the Radas' payments to Matykiewicz constitute prima facie evidence of their loss. *Wilkinson*, 202 Ariz. at 29, ¶ 9, 39 P.3d at 1133.    The court must then subtract from this sum any value Matykiewicz conferred on the Radas.    This difference will usually be the victim's loss.    To this figure, the court must apply the remaining parts of *Wilkinson*'s three-part test – that is, it may not compensate the Radas for "expenses [they] incurred because [the unlicensed contractor] failed to complete the work he contracted to do or did so in a faulty manner."  *Id.* ¶ 10.

¶28    We are aware that criminal restitution may not provide victims the full benefit of their bargain because giving such relief may require consideration of losses that do not flow

directly from the crime or involve losses that are not "economic." But we cautioned in *Wilkinson* that "[p]otential problems arise if we too broadly combine civil liability with criminal sentencing." *Id.* at 30, ¶ 12, 39 P.3d at 1134. The concern remains valid today. We quoted with approval the following description of the problems that may arise in not adhering to the legislative limitation of restitution to "economic loss":

> If reparations as a condition of probation are to include elements beyond mere "special damages" we believe a trial court must use great caution. The sentencing phase of a criminal case is not the ideal forum for the disposition of a [civil] case. Both parties are deprived of a jury; the defendant may be limited in showing causation or developing a defense of contributory negligence or assumption of risk.

*Id.* (quoting *State v. Garner*, 115 Ariz. 579, 581, 566 P.2d 1055, 1057 (App. 1977)) (alteration in *Wilkinson*). Today's decision does not alter any rights a homeowner may have to recover any indirect or non-economic damages in a subsequent civil action against the unlicensed contractor. *See* A.R.S. § 13-807. Nor does our decision limit any defenses an unlicensed contractor may have in such actions. It preserves each party's civil jury trial right.

### III. CONCLUSION

¶29    For the foregoing reasons, we reverse the opinion of the court of appeals, affirm the judgment of the superior court,

and remand the case to the Town of Gilbert Municipal Court for proceedings consistent with this opinion.


_____
                              Rebecca White Berch, Vice Chief Justice


CONCURRING:


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice



**H U R W I T Z**, Justice, concurring in part and concurring in the result

¶30       The term "economic loss" in A.R.S. §§ 13-603(C) and -804 should be given its commonsense meaning when the case involves contracting without a license.  Thus, the victim should receive the difference between what he paid the unlicensed contractor and the value of what he received in return.  If the restitution statutes are read to require that the amount paid is invariably the measure of restitution, an untenable result would obtain – a homeowner who received flawless work from an unlicensed contractor would be refunded the full amount paid but would nonetheless also retain the work performed.  It is

impossible for me to view such a victim as having suffered any loss, economic or otherwise, and I therefore concur in ¶¶ 1-18 of the majority opinion.

¶31     I write briefly, however, to address the subject that divides the majority and the dissent – the effect to be given to *State v. Wilkinson*, 202 Ariz. 27, 39 P.3d 1131 (2002).  The majority correctly notes that *Wilkinson* is factually distinguishable.  The issue in that case was whether the victim could recover restitution *above* the amount paid to the unlicensed contractor; the issue here is whether the amount paid is the appropriate amount of restitution when the homeowner has received value in return.  Thus, the narrow holding in *Wilkinson* does not control the case before us.

¶32     But it is not just the narrow holdings of our prior cases that are entitled to respect under the doctrine of stare decisis.  Rather, deference should also properly extend to the Court's core rationale, the reasoning essential to the result in the prior case.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67 (1996); *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

¶33     As the Chief Justice notes in her dissent, the essential premise of *Wilkinson* was that the crime of contracting without a license was complete when the victims paid the

unlicensed contractor. *See Wilkinson*, 202 Ariz. at 29 ¶¶ 9, 39 P.3d at 1133. *Wilkinson* therefore held that the quality of any work performed under the contract was irrelevant to the issue of criminal restitution. *Id.* ¶ 10. Rather, because the crime was complete before any work was done, *Wilkinson* reasoned that the appropriate measure of "economic loss" suffered by a victim of unlicensed contracting is the amount paid to the contractor. *Id.* at 29-30 ¶¶ 8-14, 39 P.3d at 1133-34. Applying this rationale, the victims in this case would receive restitution of their total payments to Matykiewicz, regardless of the value of any completed work.

¶34    This, however, does not end the inquiry. Although stare decisis has powerful force, "[i]t is a doctrine of persuasion . . . and not an ironclad rule." *Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 107, 859 P.2d 724, 730 (1993). Even in cases involving statutory construction, "we are not prisoners of the past," particularly when the language of the statute at issue "does not compel the interpretation reached in previous cases." *Id.*

¶35    Applying the rationale of *Wilkinson* to the case before us would lead to a conclusion that a victim has "economic loss" under the restitution statutes even if he has none in reality. Whatever its stare decisis effect, I cannot accept *Wilkinson*'s

rationale when it would produce a result at odds with the language of the restitution statutes.

¶36 The policy behind the doctrine of stare decisis is that the public should be able to rely on prior judicial opinions in conducting affairs. *Lowing*, 176 Ariz. at 107, 859 P.2d at 730. That policy is not implicated in this case. No victim of an unlicensed contractor could have relied on *Wilkinson*. As then-Judge Ryan once aptly noted, those with knowledge that a contractor with whom they deal is unlicensed are not victims at all, but rather accomplices to the offense not entitled to restitution. *State v. Wilkinson*, 198 Ariz. 376, 383 ¶ 36, 10 P.3d 634, 641 (App. 2000) (Ryan, J., dissenting). And it goes without saying that an unlicensed contractor could not have relied to his detriment on *Wilkinson*, as that case would impose broader liability on him than the Court's decision today. *See* Benjamin N. Cardozo, *The Nature of the Judicial Process* 151 (1921) ("There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants.").

¶37 In short, although I recognize that *Wilkinson*'s rationale would produce a different result if applied to this case, I find its reasoning contrary to the clear directive of

the statute that a victim must suffer an actual loss before receiving restitution. In the case of unlicensed contracting, loss is measured by the difference in value between what the victim paid and what he received. I therefore concur in the judgment of the Court.

_____

Andrew D. Hurwitz, Justice


**M c G R E G O R**, Chief Justice, dissenting:

¶38 I respectfully dissent. Today's decision, without compelling reason or justification, essentially overturns this Court's recent decision in *State v. Wilkinson,* 202 Ariz. 27, 39 P.3d 1131 (2002). Because I cannot join an approach that so casually ignores the basic doctrine of stare decisis, I cannot join today's Opinion.

¶39 Despite the majority's assertions otherwise, this case fits precisely within the rule of law we established in *Wilkinson.* The action against Matykiewicz, like the action against the defendant in *Wilkinson*, began when dissatisfied homeowners filed a complaint against a contractor with the Registrar of Contractors. In both instances, the homeowners

- 23 -

then learned that the person with whom they had contracted was not licensed. In both cases, the unlicensed contractor was convicted of violating Arizona Revised Statutes (A.R.S.) section 32-1151 (2008). In *Wilkinson*, we concluded:

> As a direct result of [the defendant's] offer to act as a licensed contractor, [the victims] agreed to pay, and did pay, all or a portion of the amounts due under their agreements with [the defendant]. [The defendant's] criminal actions directly caused those losses. . . . Under Arizona's statutes, these victims are entitled to recover their payments to [the defendant] as restitution.

202 Ariz. at 29 ¶ 9, 39 P.3d at 1133.

¶40    The doctrine of stare decisis thus compels that Matykiewicz be ordered to return all monies paid under the agreement as restitution because his criminal actions caused those losses without the intervention of additional causative factors. *See White v. Bateman*, 89 Ariz. 110, 114, 358 P.2d 712, 714 (1961) ("The fact that the construction of the statute in question rests on a single case does not render it any less the duty of this court to utilize the doctrine of stare decisis . . . .").

¶41    The rule of law depends to a great extent upon a healthy respect for precedent. "The doctrine of *stare decisis,* which requires us to give weight to previous decisions addressing the same issue, seeks to promote reliability so that parties can plan activities knowing what the law is." *Galloway*

- 24 -

*v. Vanderpool*, 205 Ariz. 252, 256 ¶ 16, 69 P.3d 23, 27 (2003) (McGregor, J.). "*Stare decisis* reflects a policy judgment that in most matters it is more important that the applicable rule of law be settled than that it be settled right." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (internal quotation omitted). Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

¶42    Because an evenhanded, predictable, and consistent approach to applying the law is essential to the integrity of the judicial process, we do not lightly overrule precedent; we do so only for compelling reasons. "[A]ny departure from the doctrine of *stare decisis* demands special justification." *Arizona v. Rumsey,* 467 U.S. 203, 212 (1984); *see also State v. Davis*, 206 Ariz. 377, 384 n.4 ¶ 34, 79 P.3d 64, 71 n.4 (2003) (Berch, J.) (A relatively recent decision of this Court is not "lightly overrule[d]."). "While the phrase 'special justification' defies simple definition, it does require more than that a prior case was wrongly decided." *State v. Hickman*, 205 Ariz. 192, 200 ¶ 37, 68 P.3d 418, 426 (2003) (Ryan, J.). Even when this Court has doubted the wisdom of precedent, we

have followed previous opinions based upon our respect for the doctrine of stare decisis and our recognition of its importance. *See State v. Lara*, 171 Ariz. 282, 285, 830 P.2d 803, 806 (1992) (restating the holding of a previous case despite the fact that if the Court had been "writing on a clean slate" it might have taken another approach); *Stewart v. Damron*, 63 Ariz. 158, 165, 160 P.2d 321, 324 (1945) (doubting the wisdom of prior decisions, but finding the matter foreclosed by stare decisis).

¶43    Our failure to apply the doctrine of stare decisis in this case is especially troubling for two reasons.  First, resolving the issue presented here and in *Wilkinson* required us to interpret a statute.  "When a court proposes to abandon precedent in a case involving . . . statutory interpretation[,] the burden is highest."  *Hickman*, 205 Ariz. at 201 ¶ 38, 68 P.3d at 427; *see also State v. Fell*, 210 Ariz. 554, 561 ¶ 26, 115 P.3d 594, 601 (2005) (Hurwitz, J.) ("[O]ur deference to precedent is strongest when prior decisions construe a statute." (quoting *Galloway*, 205 Ariz. at 256 ¶ 16, 69 P.3d at 27)).  The reason we give the most deference when construing a statute is because "if we have interpret[ed] the statute other than as the legislature intended, the legislature retains the power to correct us."  *Hancock v. Bisnar*, 212 Ariz. 344, 349 ¶ 22, 132 P.3d 283, 288 (2006) (Hurwitz, J.) (internal quotation omitted).

In the six years since *Wilkinson*, the legislature has given no indication whatsoever that we incorrectly construed Arizona's restitution statutes. Today, the majority simply ignores the legislature's apparent approval of the statutory interpretation of *Wilkinson* and adopts a new interpretation.

¶44 Second, the majority neither provides any compelling reason nor points to any change in the law that justifies overturning our prior decision. That approach is inconsistent with our insistence that some strong reason justify a departure from prior decisions. The doctrine of stare decisis "should be adhered to unless the reasons of the prior decisions have ceased to exist or the prior decision was clearly erroneous or manifestly wrong." *White*, 89 Ariz. at 113, 358 P.2d at 714; *see also Neal v. United States*, 516 U.S. 284, 295 (1996) (finding that once a court has determined a statute's meaning, the court should adhere to that ruling absent "intervening development of the law" or "compelling evidence bearing on [the legislature's] original intent"). The ordinary reasons for failing to adhere to the doctrine of stare decisis are not present in this case. No intervening development in the law pertaining to criminal restitution has occurred since *Wilkinson* was issued in 2002. Also, the result directed by *Wilkinson*, that all monies paid under the contract must be returned, is not clearly erroneous.

It remains true that forcing a criminal to yield the fruits of his crime to his victim furthers the original conception of restitution. *See Wilkinson*, 202 Ariz. at 29 ¶ 9, 39 P.3d at 1133. It remains true that the rule of *Wilkinson* protects the public from unlicensed contractors by rehabilitating offenders and thus preventing them from again contracting without a license. *Id.* at 30 ¶ 13, 39 P.3d at 1134. Further, the result in *Wilkinson* prevents the problems that arise when we "too broadly combine civil liability with criminal sentencing." *See id.* at 30 ¶ 12, 39 P.3d at 1134 ("The sentencing phase of a criminal case is not the ideal forum for the disposition of a [civil] case." (quoting *State v. Garner*, 115 Ariz. 579, 581, 566 P.2d 1055, 1057 (App. 1977))). Today's opinion will transform restitution hearings into the equivalent of complex civil trials, held without benefit of a jury.

¶45 The doctrine of stare decisis ensures that a court's current decisions remain tied to precedent, not simply to respect precedent, but to promote the continuity and predictability so essential to the rule of law. My greatest concern with today's decision is that it separates this Court's analytical framework from our long adherence to stare decisis. When we ignore precedent without a compelling reason for doing so, we undermine public trust in the integrity of the law. I do

not believe this case justifies undermining such trust and confidence, and therefore dissent.

_____
Ruth V. McGregor, Chief Justice